# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| **Joe Baltas, Inmate No. 339650** | **CASE NO.** |
| **PLAINTIFF** | |
| **v.** | |
| **Lieutenant Paul Frenis,** in his individual capacity; | |
| **Correctional Officer __ Ragauskas,** in her individual capacity; | |
| **Correctional Officer Stephanie Gryken,** in her individual capacity; | |
| **Warden Denise Dilworth,** in her individual capacity; | |
| **Deputy Warden David Egan,** in his individual capacity; | |
| **Deputy Warden Kimberly Jones,** in her individual capacity; | |
| **Counselor Supervisor Michael Calderon** | |
| **Correctional Officer __ LeFevre,** in his individual capacity; | |
| **Correctional Officer __ Peralta,** in his individual capacity; | |
| **Correctional Officer __ Guest,** in his individual capacity; | |
| **Correctional Officer __ McGoldrick,** in his individual capacity; | |
| **LPC Linda Andrade,** in her individual capacity. | |
| | **July 16, 2018** |

DEFENDANTS                    |

**A JURY TRIAL IS HEREBY DEMANDED**
**AND**
**A PREJUDGMENT REMEDY SOUGHT**

**COMPLAINT**

## A. INTRODUCTION

1. The Plaintiff alleges under 42 U.S.C. §§1983 and 1988 that the behavior of the Defendants violated the First, Fourth, Eighth, and Fourteenth Amendments to the United States Constitution ("Constitution").

## B. PRELIMINARY STATEMENT

2. Plaintiff herein, Joe Baltas, is an inmate in the custody and control of the Commissioner of the Connecticut Department of Correction ("DOC") and was at all times relevant to this complaint held at the Garner Correctional Institution ("Garner") in Newtown, Connecticut.

3. Plaintiff alleges that the Defendants acted individually and/or in concert under color of their authority as DOC personnel to violate DOC policies and Administrative Directives established to protect the rights of inmates under the Constitution and 42 U.S.C. §§ 1983 and 1988.

4. The Plaintiff specifically alleges that the Defendants acting alone and/or in concert:

    a. attempted to intimidate Plaintiff so that he would not file grievances, and retaliated against him when he did file grievances;
    b. employed excessive force against Plaintiff;
    c. exercised deliberate indifference to Plaintiff's medical condition;
    d. failed to exercise supervision over Garner staff and/or to prevent harm to Plaintiff
    e. Torture of Plaintiff by their actions and failure to act appropriately to protect Plaintiff.

## C. JURISDICTION AND VENUE

5. The Court has jurisdiction over the Plaintiff's claims of clear and egregious violations of his Federal Constitutional Rights under 28 U.S.C. §§ 1343(a)(3), 1331, and 1367(a).

6. Local Rule 4(c) (Amended January 18, 2017) permits Pre-Judgment Remedies as part of this filing and further requested by this Plaintiff, in the interests of justice.

7. The events giving rise to the Causes of Action described herein occurred in the District of Connecticut, and thus venue is appropriate under 28 U.S.C. § 1391(b)(2).

## D. PARTIES

8. Plaintiff Joe Baltas ("Baltas") is inmate number 339650 of the DOC. At all times mentioned in this complaint, he was housed at Garner.

9. The first named Defendant, Paul Frenis ("Frenis") was at all times mentioned in this complaint a Correctional Lieutenant employed at Garner. He is sued in his individual capacity.

10. The second named Defendant, __[1] Ragauskas ("Ragauskas") was at all times mentioned in this complaint a Correctional Officer employed at Garner. She is sued in her individual capacity.

11. The third named Defendant, Stephanie Gryken ("Gryken") was at all times mentioned in this complaint a Correctional Officer employed at Garner. She is sued in her individual capacity.

12. The fourth named Defendant, Denise Dilworth ("Dilworth") was at all times that she is mentioned in this complaint the Warden at Garner. She is sued in her individual capacity.

13. The fifth named Defendant, David Egan ("Egan") was at all times mentioned in this complaint a Deputy Warden at Garner. He is sued in his individual capacity.

14. The sixth named Defendant, Kimberly Jones, was at all times mentioned in this complaint a Deputy Warden at Garner. She is sued in her individual capacity.

15. The seventh named Defendant, Michael Calderon, was at all times mentioned in this complaint a Counselor Supervisor at Garner. He is sued in his individual capacity.

16. The eighth named Defendant, __ LeFevre ("LeFevre"), was at all times mentioned in this complaint a Correctional Officer employed at Garner. She is sued in her individual capacity.

17. The ninth named Defendant, __ Peralta ("Peralta"), was at all times mentioned in this complaint a Correctional Officer employed at Garner. He is sued in his individual capacity.

18. The tenth named Defendant, __ Guest ("Guest"), was at all times mentioned in this complaint a Correctional Officer employed at Garner. He is sued in his individual capacity.

19. The eleventh named Defendant, __ McGoldrick ("McGoldrick"), was at all times mentioned in this complaint a Correctional Officer employed at Garner. He is sued in his individual capacity.

20. The twelfth named Defendant, Linda Andrade ("Andrade"), was at all times mentioned in this complaint an LPC working at Garner. She is sued in her individual capacity.

21. All named Defendants were, employees of the State of Connecticut Department of Corrections for purposes of this complaint, and all acted under color of their authority as state officials and/or supervisors for the Connecticut Department of Corrections.

E. CAPACITY OF DEFENDANTS

22. All correctional officials are being sued in their individual capacities only.

---

[1] The first names of five of the defendants are unknown. Where this is the case, a short blank has been inserted in place of a first name so as to indicate this.

F.  PREVIOUS LAWSUITS

23. The Plaintiff herein has not brought any other lawsuits in either state or federal court dealing with these facts and circumstances, and does plan to pursue a prejudgment remedy as is also attached to this complaint.

G.  PREVIOUS DISMISSED ACTIONS OR APPEALS

24. The Plaintiff has had no civil actions or appeals, in either state or federal court, which were dismissed as frivolous, malicious, or for failure to state a claim upon which relief can be granted.

H.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

25. Pursuant to the Prisoner Litigation Reform Act, codified under 42 U.S.C. § 1997e(a), the Plaintiff has properly exhausted all available administrative remedies by following the Connecticut Department of Correction directives.

I.  STATEMENT OF THE FACTS

26. On November 1, 2017, Plaintiff was transferred to Garner.

27. Plaintiff had previously been incarcerated at Garner, where he maintains that he was harassed and subjected to excessive force and, at the time of the November 1 transfer, there was an active Staff Separation Profile ("Profile") that resulted from these prior incidents, naming Officer Poma ("Poma").

28. Plaintiff spoke with numerous staff at Garner and communicated clearly to them that his placement at Garner put him at risk.  Deputy Warden Egan assured Plaintiff that he would not have any contact with Poma and that he would be safe at Garner.

29. On November 21, 2017, Poma worked Plaintiff's Unit and sought to intimidate Plaintiff by starting at him for long periods and cracking his knuckles.

30. Plaintiff notified his Unit Manager of Poma's actions, and the Manager assured Plaintiff that he would not have any further contact with Poma.

31. Subsequently, Plaintiff was harassed by other DOC personnel who threatened his well-being and attempted to instigate conflicts, often referring to Poma.

32. On December 15, 2017, Plaintiff notified Warden Dilworth of the harassment, including a threat made by Lt. Frenis to "set you up so that we can fuck you up."

33. On January 11, 2018, Plaintiff filed a Level 1 grievance regarding the continuing harassment and threats.

34. After Plaintiff received notice that the grievance had been received, harassment increased. Multiple shake-down searches of his cell were conducted by DOC personnel within hours of

4

each other, resulting in damage to Plaintiff's personnel property.

35. Plaintiff was told by Correctional Officer Gomes that "this is how we treat inmates who file grievances on us."

36. On February 5, 2018, at or about 11:50 AM, Officer Ragauskas reported that Plaintiff had exposed himself to her and/or masturbated in front of her.

30. Lt. Frenis entered the Unit and told Plaintiff that Officer Ragauskas had told Frenis that Plaintiff had been caught masturbating.

31. Plaintiff contested the accusation and asked Frenis to review the video from the cameras on the unit.

32. Frenis, standing outside Plaintiff's cell, ordered Plaintiff to pack his belongings preparatory to being moved to the segregation unit.

33. While Plaintiff was complying with Frenis's order, with Frenis remaining outside the cell, the door to the cell being closed and locked, Frenis pointed to a toothbrush sitting on Plaintiff's toilet, opened the trap, and shouted "Drop the weapon!"

34. Frenis, then sprayed Plaintiff with a chemical agent ("Mace") through the trap, striking Plaintiff in the eyes and face, causing Plaintiff to inhale a substantial dose of the Mace.

35. Plaintiff sought to rinse out his eyes but discovered the sink in his cell had been shut off and no water was available. While Plaintiff was still at the sink, Frenis again discharged Mace at Plaintiff's eyes and face.

36. Plaintiff then placed his hands through the trap and was secured, and Frenis entered Plaintiff's cell.

37. Plaintiff was forced to undergo a so-called "controlled strip search" while still suffering the effects of the Mace. This involved Plaintiff being bent over a bunk with his face pushed into the bedding while his clothing was forcibly removed by a group of male officers. A female officer was present during this process and was responsible for videotaping the search.

38. Plaintiff was marched to the open cell door naked, while inmates and officers looked on. At the cell door he was issued boxers and a jumpsuit in lieu of a set of uncontaminated clothing.

39. The Camera Officer at this time attempted to photograph Plaintiff, who had difficulty complying (i.e., remaining still) due the pain and breathing problems caused by the Mace. And, in response, Frenis ordered that Plaintiff be given a Disciplinary Report ("DR") for failure to obey a direct order.

40. Plaintiff was then escorted to the Medical Unit by Frenis and a group of other officers. During the escort, Frenis delayed Plaintiff's reaching medical, first by ordering the escort to halt and

5

conduct a pat-down search of Plaintiff; and Second, by ordering the officers to take Plaintiff to Medical "the long way," rather than by the direct route. The "long way" was approximately four times the distance.

41. When Plaintiff arrived at the Medical Unit, he was administered a nebulizer treatment to restore his ability to breath (Plaintiff was subsequently issued an inhaler because of aggravation of his resulting from this incident). During the treatment, Frenis continued to tap his container of Mace in a suggestive and menacing manner.

42. After the nebulizer treatment, Plaintiff was escorted to the segregation unit. There, after signing off on the video recording, Frenis told the Plaintiff that they "would do it again soon."

43. Plaintiff was then given DRs for "public indecency," "disobeying a direct order," and "threats," the last referring to an allegation that Plaintiff had threatened to stab anyone who came into Plaintiff's cell.

44. On February 6, 2018, Plaintiff filed a request with Warden Dilworth regarding the incident and the DRs and requesting that the video of the incident be reviewed and that the Connecticut State Police be informed of the incident and requested to investigate. Warden Dilworth failed to inform the Connecticut State Police of this request.

45. On the evening of February 6, 2018, Frenis issued an additional DR against the Plaintiff for "threats"; however, this DR, which referred to the incident of the previous day, was issued more than 24 hours following the incident. Facility Staff requested that Plaintiff return the misfiled DR, but Plaintiff refused. Frenis then filed a new DR containing a falsified date and time.

46. On February 7, 2018, Plaintiff met with Attorney Cannatelli. At the end of that visit, Warden Dilworth, together with Deputy Wardens Jones and Egan, came to see Plaintiff. When Plaintiff asked that he be permitted to have Attorney Cannatelli present at the meeting, the Wardens refused, and Attorney Cannatelli departed.

47. Plaintiff repeated his description of the events of February 5 to the Warden and Deputy Wardens, who told the Plaintiff that they would "review everything and take appropriate action."

48. On February 13, 2018, Investigator Sciascia informed the Plaintiff that, on review of the videos from the February 5 incident, the Garner administration had determined that Ragauskas had filed a false report and all but one of the DRs issued to Plaintiff had been dismissed. However, on the basis of this last DR, Plaintiff was to remain in segregation.

49. Plaintiff attempted to plead "no contest under duress" to the remaining "threats" DR but was forced to relinquish this claim under threats that if Plaintiff did not so relinquish the claim of duress, he would remain in segregation.

50. In spite of the finding that Ragauskas complaint against Plaintiff was unsubstantiated, Ragauskas continued to work the unit from time to time after February 13, 2018 and to harass Plaintiff.  Ragauskas described Plaintiff as a "pervert" and "rapist" to staff and to other inmates, apparently in an attempt to incite violence against Plaintiff.

51. On February 21, 2018, Plaintiff received a written response to his grievance regarding his safety and harassment.  Warden Dilworth wrote that "There is no evidence of staff being unprofessional…" and that Plaintiff's grievance was "unsubstantiated."

52. On February 26, 2018, Plaintiff requested State Police and PREA interventions, and separation from the Officers involved the February 5, 2018 incident.

53. On February 27, 2018, CO Stephanie Gryken, a friend of Frenis and Ragauskas, told Plaintiff that she "would fuck with [him] all day" since I "wanted to file grievances against [her] people."

54. Gryken shook down Plaintiff's cell—and only Plaintiff's cell—on multiple occasions, damaging his personal property; issued Plaintiff a broken razor; and denied Plaintiff allotted time for recreation and access to the telephone.

55. Plaintiff reported the harassment by Gryken, but no action has been taken.

56. On February 28, 2018, Plaintiff's legal mail was improperly opened.  At about the same time, Plaintiff was prevented from placing a legal call for approximately one week.

57. At some point in early March, CO Fulton shook down Plaintiff's cell and removed legal documents; these were later returned by Lieutenant Grey.

58. Ragauskas has continued to work the Unit where Plaintiff was housed, notably on or about March 5 and March 13 of this year.  On the latter date, she continued to harass Plaintiff, shaking his cell door and falsely reporting problems, leading to various Lieutenants entering Plaintiff's cell.

59. On March 14, 2018, Frenis entered the Unit and engaged Plaintiff in a "stare down."  Warden Dilworth toured the Unit with Frenis.  After Frenis left the Unit, Plaintiff spoke to Dilworth about his concerns with having Frenis on the Unit.  Warden Dilworth told Plaintiff "we'll go where we want and do what we want."

60. On March 15, Frenis continued the pattern of harassment by shaking the door to Plaintiff's cell in an aggressive manner.  Of the cells on the Unit, only Plaintiff's was so treated.

61. On March 16, 2018, Frenis again shook and pretended to inspect Plaintiff's cell door and told Plaintiff that if Plaintiff "kept it up" he [Frenis] was going to "fuck [me] up way worse next time."

62. On April 10, Investigator Sciascia informed Plaintiff that Deputy Warden Jones had ordered Plaintiff to attend to Chronic Discipline Hearing.  Plaintiff requested, as Advocate, Correctional Treatment Officer Paolo Santilli ("CTO Santilli").

63. On April 11, Counselor Supervisor Michael Calderon ("Calderon") conducted the Chronic Discipline Hearing, denying Plaintiff access to CTO Santilli and telling him that it "[didn't] matter, the deps want you in chronic."  As a result of the Chronic Discipline Hearing, Plaintiff was placed on Chronic Discipline status (a minimum of 90 days of placement in segregation).

64. On April 12, CO Lefevre issued Plaintiff a DR for public indecency; subsequently, Captain Michael Capellaro reviewed video of Plaintiff's cell and found the DR to be unsubstantiated.

65. On April 14, Frenis threatened Plaintiff while Plaintiff was in the shower; Plaintiff subsequently gave a statement to Captain George Hurdle.  No action was taken as a result.

66. On May 15, LPC Andrade issued Plaintiff a DR for public indecency.

67. On May 20, Plaintiff responded by filing with Lt. Carmine Rinaldi a PREA complaint regarding Andrade.

68. On May 25, during first shift, CO Peralta performed a second shakedown of Plaintiff's cell, during which the Officer damaged Plaintiff's personal property, including legal documents. Plaintiff requested a supervisor and, when access to a supervisor was denied, protested by holding open his cell's trap, to which Captain Hurdle responded.

69. Later on May 25, during second shift, LPC Andrade toured Plaintiff's unit together with Counselor Sander and stopped in front of Plaintiff's cell and made comments regarding Plaintiff's PREA complaint regarding her.

70. Still later on May 25, Plaintiff was issued multiple DRs, including two from CO Peralta for interfering with safety and destruction of property; from CO Guest, for threats; and from Sander, for public indecency.

71. On May 26, LPC Andrade entered the unit and told the Plaintiff that she was responsible for the multiple DRs of the previous day, stating "I got you five tickets!"

72. On May 29, Deputy Warden Jones ordered Captain Hurdle to remove all Plaintiff's property from Plaintiff's cell, including Plaintiff's legal papers.  Plaintiff's legal papers were placed in the unit office.

73. On both May 30 and May 31, CO Peralta issued multiple DRs to Plaintiff, citing insulting language and threats.

74. On May 31, staff conducted a disciplinary hearing on LPC Andrade's accusations against Plaintiff; the hearing was held without Plaintiff's presence, although Plaintiff had requested a continuance.

75. On May 31, at approximately 10:00 AM, the Deputy Wardens entered the Counselors' office and examined Plaintiff's legal work, which had been removed from Plaintiff's cell on May 29. Plaintiff was subsequently informed that he could have approximately half of his legal papers but none of his law books.

76. On June 3, CO Guest told Plaintiff that "they would keep fucking with [him]" and that "no one was going to stop them, [Plaintiff] should know by now."

77. On June 3, at about 4:00 PM, CO McGoldrick came onto the unit for second shift.

78. On June 3, at about 4:30, CO McGoldrick placed Plaintiff's dinner tray into the sliding trap. When Plaintiff asked for milk, CO McGoldrick said "Go fuck yourself, courtesy of Guest!" CO McGoldrick and Plaintiff engaged in mutual taunting behavior, after which CO McGoldrick used the slider to slam Plaintiff's hand in the trap multiple times. After Plaintiff was able to remove his injured hand, CO McGoldrick continued to slam the trap on Plaintiff's tray.

79. On June 3, at about 5:00 PM, Lt. Cross entered the unit and Plaintiff reported the incident to him, requesting that the Connecticut State Police be notified. Lt. Cross photographed the scene and had CO McGoldrick removed from the unit.

80. Lt. Cross, later that same evening, informed the Plaintiff that Deputy Warden Egan had ordered him, via electronic mail, not to contact the Connecticut State Police.

81. The events related above, taken together, demonstrate a pattern of intimidation intended to intimidate Plaintiff so that he would cease filing grievances against Garner staff and punishment to further intimidate him if he did not so cease. The intimidation and retaliation experienced by Plaintiff caused harm in that it was an attempt to interfere with Plaintiff's rights guaranteed by the Constitution of the United States, and because it resulted in physical injuries to the Plaintiff.

J. <u>CAUSES OF ACTION</u>

<u>COUNT I: UNLAWFUL INTIMIDATION AND RETALIATION (Defendants Andrade, Calderon, Dilworth, Egan, Frenis, Gomes, Gryken, Guest, LeFevre, Peralta, and Ragauskas)</u>

82. Paragraphs 1-80 are hereby made part of this Count I.

83. Statements made to Plaintiff by Defendants Dilworth (¶ 59), Frenis (¶ 32, 42, 59, 61, 65), Gomes (¶ 35), Gryken (¶ 53) and Guest (¶ 82), individually and/or in concert, were attempts to intimidate Plaintiff from filing grievances against themselves and/or other staff by threatening that if he did so, it would result in retaliation against Plaintiff.

84. The statements made to, and actions taken toward Plaintiff by Defendants Frenis (¶¶ 36-43, 45, 60) on the pretext of Ragauskas' accusation (¶ 36), later discovered to be unsubstantiated (¶ 48), by Gryken (¶ 54), Calderon (¶ 63), LeFevre (¶ 64), Andrade (¶ 66, 71), Guest (¶ 70), Peralta (¶ 70), and Egan (¶ 80) were retaliatory in nature.

85. These statements and actions by the named Defendants were intended to prevent Plaintiff from, and to punish the Plaintiff for, exercise of his right under the first amendment of the Constitution of the United States to petition the government for the redress of grievances.  The large number of DRs issued to Plaintiff (e.g., for public indecency) and then subsequently dismissed as unsubstantiated, even without the statements of some of the Defendants, demonstrates a pattern of Defendants using DRs as retaliation for Plaintiff's filing grievances.

COUNT II:  EXCESSIVE USE OF FORCE (Defendant Frenis)

86. Paragraphs 1-84 are hereby made part of this Count II.

87. Defendant Frenis's use of Mace against the Plaintiff while Plaintiff was at the time secured in his cell. (¶¶ 34-37) constituted excessive use of force and unnecessary cruel and unusual punishment under the eighth amendment of the Constitution of the United States.  At no time during the interaction between Frenis and Plaintiff prior to the former's discharge of Mace did Plaintiff constitute a risk to Frenis or any other Garner staff or inmate.  As a result of being sprayed with Mace, Plaintiff suffered eye and skin pain and significant breathing difficulty, and was required to begin using a nebulizer to enable normal breathing.

COUNT III:  DELIBERATE INDIFFERENCE (Defendant Frenis)

88. Paragraphs 1-87 are hereby made part of this Count III.

89. Defendant Frenis's actions in delaying Plaintiff access to treatment (¶¶ 37-40) following Frenis's use of Mace against Plaintiff constituted deliberate indifference, under the eighth amendment of the United States Constitution, toward the needs of the Plaintiff for urgent medical treatment following exposure to a chemical agent, as outlined in the Department of Correction's own Administrative Directives. The delay thus engendered extended the Plaintiff's suffering as outlined in ¶ 87, and may have contributed to Plaintiff's subsequent need for a nebulizer.

COUNT IV: COMMON LAW BATTERY (Defendant McGoldrick)

90. Paragraphs 1-89 are hereby made part of this Count IV.

91. McGoldrick's use of the trap to injure Plaintiff (¶¶ 77, 78) constitutes common law battery. McGoldrick intended to, and in fact did, cause physical harm to Plaintiff through his manipulation of the trap mechanism.  Plaintiff suffered cuts and bruises to his hand.

COUNT V:  FAILURE TO SUPERVISE AND PROTECT (Defendants Dilworth, Egan, and Jones)

92. Paragraphs 1-91 are hereby made part of this Count V.

93. Defendants Dilworth, Egan, and Jones, had been informed by Plaintiff of issues with the DRs, particularly regarding the multiple unsubstantiated DRs arising out of the incident on February 5.  That they did not subsequently issue and enforce profiles with respect to Plaintiff and certain officers permitted an officer who had made a false report against Plaintiff (Defendant Ragauskas) to continue working Plaintiff's unit (and indeed did not find that officer's conduct unprofessional), and that on multiple occasions they did not call or intercepted attempts to call the Connecticut State Police, taken together, indicate a failure on their part to supervise the staff at Garner.  Defendants were on notice of the threats and took no action to secure Plaintiff's safety subsequent to harm, and instead took steps to "clear" offending staff and cover up staff misconduct.

COUNT VI:  DEPRIVATION OF DUE PROCESS OF LAW (Defendants Egan and Jones)

94. Paragraphs 1-93 are hereby made part of this Count VI.

95. Defendants' seizure and examination of Plaintiff's legal papers, beyond mere inspection of those papers for concealed contraband, worked a deprivation of Plaintiff's right to due process under the fourteenth amendment to the Constitution of the United States.

COUNT VII:  DEPRIVATION OF DUE PROCESS OF LAW (Defendant Calderon)

96. Paragraphs 1-95 are hereby made part of this count VII.

97. Defendant Calderon, by denying Plaintiff access to his advocate and by holding a Chronic Discipline Hearing in Plaintiff's absence, deprived Plaintiff of his right to due process under the fourteenth amendment to the Constitution of the United States.

COUNT VIII:  SUBJECTION TO ATYPICAL AND SIGNIFICANT HARDSHIP

98. Paragraphs 1-97 are hereby made part of this count VIII.

99. As a consequence of the actions and failures to act of Defendants, as set forth in Counts I and V-VIII inclusive, Plaintiff was assigned to continuous restrictive housing placements (including but not limited to "chronic" placement), which subjected him to atypical and significant hardship for many months, in violation of the fourth, eighth, and fourteenth amendments to the Constitution of the United States.

K. DAMAGES

WHEREFORE, PLAINTIFF SEEKS A PREJUDGMENT REMEDY AGAINST EACH DEFENDANT IN THE AMOUNT OF $100,000 OR SUCH OTHER AMOUNT AS THE COURT DEEMS JUST AND REASONABLE;

WHEREFORE, PLAINTIFF SEEKS PUNITIVE DAMAGES PURSUANT

TO 42 U.S.C. § 1983;

WHEREFORE, PLAINTIFF SEEKS REASONABLE ATTORNEYS FEE PURSUANT TO 42 U.S.C. § 1988;

WHEREFORE, PLAINTIFF SEEKS COSTS OF SUIT;

WHEREFORE, PLAINTIFF SEEKS AN INJUNCTION BARRING THE STATE FROM INCARCERATING HIM IN THE GARNER OR FACILITY;

WHEREFORE, PLAINTIFF SEEKS ANY AND ALL OTHER RELIEF, LEGAL AND OR EQUITABLE, AS THE COURT DEEMS APPROPRIATE;

WHEREFORE, THE PLAINTIFF SEEKS COMPENSATORY DAMAGES.

WHEREFORE, THE PLAINTIFF SEEKS AN ORDER THAT THE U.S. ATTORNEY INVESTIGATE THESE ALLEGATIONS FOR CRIMINAL WRONGDOING AND COVERUP BY DOC PERSONNEL.


A JURY TRIAL IS HEREBY DEMANDED.

                                    THE PLAINTIFF,
                                    JOE BALTAS
                                    Inmate No. 339650



BY _____
   ANDREW MARCHANT-SHAPIRO
   Ct No. 30095
   8 Research Parkway,
   Wallingford, Ct. 06492
   P: (203) 936-9023
   F: (203) 872-9007
   E: ams@riverbridgesolutions.com

12