IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

-------------------------------------------------------x
                                          :

JOE BALTAS                      :          CIV. NO.  3:18 CV 1168 (WWE)

                      :

v.                             :

                      :

PAUL FRENIS, ET AL.        :          DATE: APRIL 10, 2019

                      :

-------------------------------------------------------x

RULING ON THE PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY

I.     BACKGROUND AND PROCEDURAL HISTORY

On July 16, 2018, the plaintiff, Joe Baltas, an inmate in the custody of the Connecticut

Department of Correction, commenced this action under 42 U.S.C. §§ 1983 and 1988 against

Warden Denise Dilworth, Deputy Wardens David Egan and Kimberly Jones, Lieutenant Paul

Frenis, Correctional Officers ("CO") Ragauskas, Gryken, LeFevre, Peralta, Guest and

McGoldrick, Counselor Calderon, and "LPC" Andrade.  (Doc. No. 1).[1]  The plaintiff alleges that,

while he was housed at Garner Correctional Institution ("Garner"), the defendants, acting alone,

and/or in concert, attempted to intimidate the plaintiff so he would not file grievances; retaliated

against him for filing grievances; employed excessive force against him; exercised deliberate

indifference to his medical condition; failed to exercise supervision over the staff at Garner; and,

"[t]orture[d] [the] [p]laintiff by their actions and failure to appropriately protect [the] [p]laintiff."

(Doc. No. 1).

Attached to his Complaint was an Application for Prejudgment Remedy (Doc. No. 1-2),

an affidavit in support (Doc. No. 1-3), and a Motion for Prejudgment Disclosure (Doc. No. 1-5).

---

[1] On October 22, 2018, the plaintiff moved to amend his complaint as to the identity of defendant Andrade.  (Doc. No. 16).  The Court (Eginton, J.) granted the motion, absent objection, on November 26, 2018, and the plaintiff filed an amended complaint that same day.  (Doc. Nos. 20-21).

On September 11, 2018, the Court (Eginton, J.) referred the Application for Prejudgment Remedy to this Magistrate Judge. (Doc. No. 7; *see* Doc. Nos. 12-13).[2]

On October 12, 2018, the Court held a telephonic status and scheduling conference (Doc. Nos. 10, 15), during which it addressed the deficiencies in the plaintiff's affidavit filed in support of his Application for Prejudgment Remedy. (Doc. Nos. 14, 17). The Court held oral argument as to the application on October 30, 2018, following which it denied the Prejudgment Remedy as to defendants Calderon, LeFevre, Peralta, Guest, McGoldrick and Andrade because the plaintiff did not mention any of those defendants in the supporting affidavit. (Doc. No. 17).

In supplemental briefing that the Court ordered regarding the remaining defendants (Frenis, Ragauskas, Gryken, Dilworth, Egan and Jones), the parties addressed three issues: (1) whether the plaintiff's affidavit complied with the requirements set forth in the prejudgment remedy statute; (2) whether the need for an evidentiary hearing was moot in light of the State's representation to the Court that it would indemnify the defendants; and, (3) whether the plaintiff's failure to provide statutory notice in his Application for Prejudgment Remedy was fatal. (Doc. Nos. 18-19).

On November 30, 2018, the Court issued an Order Regarding the Plaintiff's Application for Prejudgment Remedy (Doc. No. 22) in which it concluded that, "unless the State is willing to assure the plaintiff that the defendants will be indemnified through the entry of a judgment, if any, in this case, the mere likelihood or probability of indemnification would not preclude the entry of a PJR." (Doc. No. 22 at 2). Additionally, as to the defendants' claim that the plaintiff's failure to provide statutory notice was fatal to his Application, this Court concluded that the defendants were

---

[2] Previously, the Application for Prejudgment Remedy was referred to Magistrate Judge William I. Garfinkel on July 23, 2018. (Doc. No. 6). The referral order was revoked on September 11, 2018, and the Application was referred to this Magistrate Judge. (Doc. No. 7).

not denied notice and had failed to demonstrate prejudice; thus, the plaintiff's failure to comply with subsections (e), (f) and (g) of CONN. GEN. STAT. § 52-278c was not fatal to his request for a PJR hearing. (Doc. No. 22 at 3). Accordingly, on January 8, 2019, the Court held an evidentiary hearing under § 52-278d, at which the plaintiff began his testimony. (Doc. No. 40-41).[3] All of the defendants named in the PJR motion appeared for the January 8, 2019 hearing, and the Court admitted, without objection, both the plaintiff's and the defendants' exhibits.[4]

On February 15, 2019, the plaintiff testified by videoconference, and Deputy Warden Egan testified for the defendants. (Doc. Nos. 46-47). Consistent with this Court's order, on March 1, 2019, the parties filed simultaneous post-hearing briefs. (Doc. Nos. 48-49).

For the reasons stated below, the plaintiff's Application for Prejudgment Remedy (Doc. No. 1-2) is DENIED, and the plaintiff's Motion for Disclosure (Doc. No. 1-5) is DENIED AS MOOT.

---

[3] Two days prior to the initial hearing date, on Sunday, January 6, 2019, the defendants filed a Motion to Bifurcate the PJR Hearing. (Doc. No. 32). The defendants moved, on the basis of safety and security concerns, to bifurcate the issues of whether there was probable cause for the entry of a prejudgment remedy, taking into account any defenses, counterclaims or set offs, from the issue of whether the payment of any judgment was adequately secured by insurance, and whether the property sought to be subjected to the prejudgment remedy was exempt from disclosure. Additionally, the defendants moved to bifurcate the motion for disclosure of assets to the extent that testimony involving personal information of the defendants was required. On January 7, 2019, the plaintiff filed his objection, arguing that the defendants' motion, filed on the eve of the hearing, was untimely, and proposing, alternatively, that the Court hold the hearing on the probable cause issue, and then hear evidence responsive to the motion for disclosure in camera. (Doc. No. 33). Later that day, the Court granted, in part, the Motion to Bifurcate, ordering that the hearing go forward as scheduled "on the issue of whether probable cause that a judgment in the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set off, [would] be rendered in favor of the plaintiff. The evidence relating to the motion for disclosure of property and assets [would] be addressed at a later time, as appropriate." (Doc. No. 34).

[4] The hearing was rescheduled to February 12, 2019 after the plaintiff's counsel had a medical emergency in the courtroom; the hearing was rescheduled again to February 15, 2019 due to weather. (Doc. Nos. 35-39, 42-45).

II.    <u>DISCUSSION</u>

A.    <u>THE PLAINTIFF'S APPLICATION FOR PREJUDGMENT REMEDY</u>

In his Application for Prejudgment Remedy, the plaintiff states that there is "probable cause that a judgment in the amount of the prejudgment remedy sought . . . will be rendered in this matte[r] in favor of the [p]laintiff . . . . [in] the sum of $100,000 (each Defendant)[.]" (Doc. No. 1-2 at 2). Attached to his Application is a signed affidavit[5] in which the plaintiff avers that he contacted Warden Dilworth, and Deputy Wardens Egan and Jones; that CO Ragauskas filed a false report and continued to harass the plaintiff; that Lieutenant Frenis threatened the plaintiff, maced him, and harassed him; and, that CO Gryken harassed him and retaliated against him for filing grievances; he also asserts allegations against three other individuals who are not named defendants. (Doc. No. 1-3).

Section 52-278c(a) requires that an affidavit in support of a prejudgment remedy sets forth "facts sufficient to show that there is probable cause" that a judgment will enter in an amount equal to or greater than the amount of the prejudgment remedy sought, "taking into account any known defenses, counterclaims or set-offs[.]" *Id.* The plaintiff's allegations in his affidavit are limited and general, and he does not aver as to the damages he suffered as a result of the actions of each of these defendants. *See Davila v. Secure Pharmacy Plus*, 329 F. Supp. 2d 311, 313 (D. Conn. 2014) (finding that the plaintiff did not "set[] forth a statement of facts to show that there is probable cause that a judgment in the amount [sought,] will enter in favor of [the] [p]laintiff . . .,

---

[5] As discussed at the oral argument held on October 30, 2018, the plaintiff's affidavit does not make any mention of defendants Calderon, LeFevre, Peralta, Guest, McGoldrick or Andrade. Accordingly, the Court denied the plaintiff's request for prejudgment remedy against those defendants. (Doc. No. 17).

as required [by] § 52-278c(a)[]").  Accordingly, the Court held an evidentiary hearing[6] to address the limited "issue of whether probable cause that a judgment in the amount of the prejudgment remedy sought, taking into account any defenses, counterclaims or set off, will be rendered in favor of the plaintiff." (Doc. No. 34).

1.  <u>FINDINGS OF FACT</u>

The plaintiff is serving a ninety-five-year sentence for murder, and a twenty-year consecutive sentence for assault. (Def.'s Ex. 505).  The plaintiff is a Chronic Discipline inmate, he is on High Security Status, and he was assigned to Administrative Segregation in December 2016 for threats against staff at Garner "and [for] his pattern of violent and dangerous behavior." (*Id.*).  In February 2014, he was assigned to Administrative Segregation for "manufacturing a weapon and using it to stab another inmate[.]" (Def.'s Ex. 505). Chronic Discipline status is dependent upon the seriousness and repetitiveness of disciplinary behavior. (Def.'s Ex. 502 at 6). Chronic Discipline, Administrative Segregation, and High Security are all restrictive status placements. (Def.'s Ex. 502).  At the time of the events at issue in this case, the plaintiff was on High Security Status because he had threatened staff, had a staff threat profile, and had a history of serious disruptive behavior. (Def.'s Ex. 502 at 11).

---

[6] An evidentiary hearing is available under the statute to

> determine whether (1) probable cause exists that judgment will enter in an amount greater than or equal to the amount sought, (2) whether payment of any judgment is adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) whether, if the prejudgment remedy is granted, the plaintiff should be required to post a security bond to protect the defendant against potential damages flowing from the prejudgment remedy (or whether the defendant should be allowed to substitute a bond for the prejudgment remedy). CONN. GEN. STAT. § 52–278c(g).

*Tucker v. Journal Register E.*, No. 3:06 CV 307 (SRU), 2009 WL 426460, at *1 (D. Conn. Feb. 20, 2009).

In addition to being a Chronic Discipline Inmate on High Security Status, the plaintiff was the subject of a staff separation profile for a correctional officer at Garner, CO Poma, because the plaintiff threatened to stab that officer. Deputy Warden Egan, who was the Deputy Warden for Operations at Garner when the plaintiff was incarcerated there, explained that, after the plaintiff threatened to stab CO Poma, he was transferred to Administrative Segregation at Northern CI, the only level five facility located in Connecticut. Eventually, the plaintiff was returned to Garner, a level four facility.

The plaintiff testified that, despite a staff separation profile involving the plaintiff and CO Poma, on at least one occasion, CO Poma interacted with, and attempted to intimidate, him. On January 11, 2018, the plaintiff filed a grievance about this interaction in which he alleged harassment and expressed concern for his health and safety. (Def.'s Ex. 517). Warden Dilworth responded to the plaintiff's complaint by noting that the final determination for housing "is at the discretion of population management[,]" and by finding that there was "no evidence" of the staff acting "unprofessional[ly]" towards the plaintiff. (Def.'s Ex. 517).

On January 12, 2018, and again the next day, the plaintiff received a public indecency Disciplinary Report ("DR" or "ticket"). (Def.'s Exs. 507-508). As to both of these tickets, he pleaded guilty, with "no contest" handwritten next to his signature. (*See id*.).[7] The plaintiff testified that he pleaded guilty because he "takes responsibility for the things [he] does."

On February 5, 2018, the plaintiff received two tickets. The first ticket was for public indecency (Def.'s Ex. 520), and the second was for threatening. (Def.'s Ex. 509). The events

---

[7] The plaintiff argues that he pleaded no contest, and the discipline ran concurrently with the discipline from the previous ticket. The plaintiff testified that "concurrent" discipline is prohibited, so, according to the plaintiff, the fact that his discipline ran concurrently shows that the disciplinary report was false.

surrounding these tickets gave rise to several of the claims at issue in this lawsuit. The plaintiff testified that, at around 11:30-11:45am on February 5, 2018, CO Ragauskas was walking through the cell block handing out razors when she reported that the plaintiff was masturbating in his cell while staring at her. (Ex. C & Ex. 518). Rauguskas issued the plaintiff a DR for public indecency. Public indecency is a Class A offense, and, once an inmate receives a Class A offense, he is processed into restrictive housing pending the adjudication of the DR.

According to the plaintiff, about ten minutes later, Lieutenant Frenis, who had previously threatened the plaintiff, and three or four other officers including a camera officer, came to his cell door. Lieutenant Frenis ordered the plaintiff to pack his belongings to go to segregation for engaging in indecent behavior. The plaintiff responded by telling Lieutenant Frenis to check the video because the report was false. The Incident Report completed by Lieutenant Frenis indicates that the plaintiff told Lieutenant Frenis, "I will make you do it the hard way today!" (Def.'s Ex. 518 at 3 of 11). Similarly, the Incident Report completed by Lieutenant Maloid states that the plaintiff would not allow staff to place him in hand restraints and told them they "would have to do this the hard way[]"; the Incident Report completed by CO Boucher states that the plaintiff said he would "rather go the hard way[]"; and, the Incident Report completed by CO Griffin reflects that the plaintiff said that he would "rather go the hard [way]." (Def.'s Ex. 218 at 4-7).

The plaintiff testified that he walked away from the door and began to pack his property. The Incident Reports consistently reflect that the plaintiff "was given a direct order to place his hand thr[ough] the trap to be cuffed up" and that he "refused and started to pack his property." (Def.'s Ex. 218 at 6 (CO Griffin); *see* Def's Ex. 218 at 5 (CO Boucher reported that the plaintiff "refused to comply with staff orders to be handcuffed."); *see* Def.'s Ex. 518 at 10 (CO Major

reported that, "[u]pon entering the unit[,] Inmate Baltas refused to comply with staff direct orders to cuff up.")). Disobeying a direct order is a Class B offense.

The plaintiff testified that, typically, an inmate is brought to segregation first, and then his property is packed by the correctional officers; he acknowledged that the order of events that day, as he described them, was "unusual." The plaintiff later testified that he was "pretty sure" he was told to pack his property and that, even if he disobeyed a direct order, the level of force that ensued was not justified.

Lieutenant Frenis was standing outside the plaintiff's cell door and could see inside the cell through a window at chest level that was two feet high and five inches wide. According to the plaintiff, Lieutenant Frenis said something about a toothbrush that was sharpened into a weapon (*see* Pl.'s Ex. B), lying on a sink located right inside the cell door. Deputy Warden Egan testified, and all of the Incident Reports reflect, that the plaintiff was "defiant and agitated" and that he threatened to stab any staff member who entered his cell. (Def.'s Ex. 509; Def. Ex. 518 at 3-7, 10-11). Lieutenant Frenis stated in his Incident Report that it was "unclear if [the toothbrush] was sharpen[ed] or not," (Def.'s Ex. 518 at 3), but in viewing the situation, Lieutenant Frenis was aware of the plaintiff's history of making weapons and of threatening to stab staff.

The plaintiff acknowledged that Lieutenant Frenis told him to come to the "trap" to "cuff up" and that he refused. At some point, Lieutenant Frenis noted that the plaintiff made what Deputy Warden Egan described as a "sudden movement" towards the toothbrush. As Deputy Warden Egan testified, and as reflected in the Incident Reports, Lieutenant Frenis, knowing the plaintiff's history of violent behavior, responded by spraying a chemical agent through the trap door. (Def.'s Ex. 518 at 3).

According to the plaintiff, he was standing five feet away from the door and from the toothbrush when Lieutenant Frenis deployed the chemical agent. The plaintiff tried to wipe the substance out of his eyes with water from the sink, but claimed that the water had been turned off.[8] The plaintiff's testimony as to his location at the time matches Lieutenant Frenis' Incident Report; after Lieutenant Frenis discharged the chemical agent "without desired effect[,]" the plaintiff "still didn't comply with my direction[,] blading his body, hovering over the toilet bowl where the toothbrush was located." (Def.'s Ex. 518 at 3). The plaintiff testified that he used toilet water to rinse his face. Lieutenant Frenis reported that, because he could not tell if the toothbrush was in the plaintiff's hand, he "deployed another burst of the chemical agent . . . , without desired effect" and then directed the plaintiff to come to the door and allow staff to place him into hand restraints. (Def.'s Ex. 518 at 3). The plaintiff still refused to comply. Lieutenant Frenis directed him again, this time warning him that a chemical agent would be used again if he failed to comply. In the absence of compliance, Lieutenant Frenis discharged another chemical agent. At that point, the plaintiff "placed his hand through the food serving trap and allowed staff to secure him." (Def.'s Ex. 518 at 3).

The plaintiff contends that, rather than providing the plaintiff with a change of clothes, a shower, and medical flushing of his eyes, the officers brought him to a shower and "forcibly" placed his head under the showerhead for several seconds, which did not remove the chemical agent. According to the plaintiff, they then executed a controlled strip search of him with female officers present. The plaintiff testified that the strip search caused him to feel demeaned, violated "and various other negative feelings." According to the plaintiff, following the strip search, he

---

[8] The plaintiff testified that Lieutenant Frenis ordered the water in the cell to be turned off. Deputy Warden Egan testified that the water was not turned off. The video of the incident was not offered at the hearing.

was ordered to stand unclothed for a photograph, but because he could not breathe, he refused to submit to the photo. Lieutenant Frenis' Incident Report reflects that a female CO "attempted to take a post restraint photograph of inmate Baltas's visual condition, but he refused to allow her to do so." (Def.'s Ex. 518 at 3).

The plaintiff acknowledged that, following the decontamination of his eyes, and the controlled strip search, Lieutenant Frenis brought him to the medical unit where he received a nebulizer treatment for fifteen to twenty minutes. On cross examination, the plaintiff testified that he was seen by a nurse and a doctor. The records from this incident reflect that "UCONN Medical RN . . . conducted a post restraint check; noting no injuries to the wrists. UCONN Medical RN . . . also cleared inmate Baltas to be housed in restrictive housing. Following completion of incident RN . . . [and] additional assessment of inmate Baltas and for precautionary measures[,] she requested inmate to be seen by Dr. Gerald Velletta in outpatient medical"; Dr. Velletta examined the plaintiff before he was released to restrictive housing. (Def.'s Ex. 518 at 3 of 11). According to the plaintiff, when Lieutenant Frenis accompanied him to restrictive housing, he told the plaintiff he would do this all again.

The DR issued by CO Rauguskas for the public indecency was dismissed for "[l]ack of evidence." (Def.'s Ex. 520). Deputy Warden Egan testified that he reviewed the video associated with this ticket and thought it was inconclusive as to whether Ragauskas witnessed the plaintiff masturbating in his cell. According to Deputy Warden Egan, there was no way to use video footage to substantiate whether the plaintiff did what Rauguskas said he did because the hallway cameras do not offer views into the cells; though the staff can look into the small window in the cell door to observe actions within the cell, there is no video camera affording a similar view into the cell.

The plaintiff pleaded guilty to the ticket issued by Lieutenant Frenis for threatening to use

a toothbrush to stab anyone who came into his cell that morning. (Def.'s Ex. 509). According to the plaintiff, he added "N.C.U.D." (no contest under duress) to his signature (Def.'s Ex. 509 at 2), but the "N.C.U.D." is crossed out on the document. (*See id.*). The plaintiff claims that he was told that he would remain in segregation and placed on chronic discipline if he did not plead guilty.

An examination of the toothbrush revealed that it was not sharpened. Deputy Warden Egan testified that the use of force deployed at the plaintiff's cell was in accordance with Administrative Directive 6.5, as Lieutenant Frenis's actions were taken in an "emergency" context. (*See* Def.'s Ex. 501, ¶ 14). Additionally, the District Office of the DOC completed an independent review of that incident, including viewing three videos. After review, the District Office concluded that the use of force through the deployment of a chemical agent was within the guidelines of the DOC. (Def.'s Exs. 501 & 518).

The plaintiff received another ticket for making a threat while officers escorted him to a restrictive housing cell (Def.'s Ex. 510), but, as Deputy Warden Egan testified, that ticket was later "compromised" or thrown out because it was not delivered in accordance with the DOC administrative directives. (Def.'s Ex. 503; *see* Def.'s Ex. 511).[9]

The plaintiff testified that, on February 6, 2018, he asked to have the Connecticut State Police investigate the incident, claiming that Lieutenant Frenis' actions constituted excessive force and assault. The plaintiff also requested to write a Prison Rape Elimination Act ("PREA") complaint because the controlled strip search and the false disciplinary report by CO Ragauskas were "sexually harassing." On February 7, 2018, the plaintiff met with his attorney, following which Warden Dilworth and Deputy Wardens Egan and Jones met with the plaintiff to discuss his

---

[9] The ticket was "issued . . . 24 hours after the incident"; the plaintiff was "issued the same DR with a different incident time"; and, there was "no date when the DR was delivered." (Def.'s Ex. 511).

concerns. On February 26, 2018, the plaintiff grieved what he described as "the inappropri[a]te and improper actions taken against [him] by [CO] Raguaskas that constitute harassment and sexual harassment." (Def.'s Ex. 515). The plaintiff avers that he also made written requests for a PREA complaint and State Police Intervention on February 26, 2018.

The plaintiff alleges that, the next day, there was a "shakedown" in his cell by CO Fulton and some of his legal papers were not returned. Additionally, according to the plaintiff, both CO Raguaskas and Lieutenant Frenis were in his unit in March, despite his request to be kept away from them both. The plaintiff testified that he complained to Warden Dilworth, and that Lieutenant Frenis would "regularly shake" him down.

In addition to his complaints of his cell being shaken down, the plaintiff also alleges that his door was physically shaken every time a correctional officer walked by it. The door, however, was shaken regularly only once officers discovered that the lock on the plaintiff's cell door was broken and had been broken for several days. (Def.'s Ex. 519). The Incident Reports reflect that there was "no evidence to substantiate" the plaintiff's allegation of retaliation, and, in fact, it was "substantiated that Baltas tampered with the integrity of his door[,]" which is a violation of Administrative Directive 9.5. (Def.'s Ex. 519). As a result, the plaintiff was issued a Class A disciplinary report for "Interfering with Safety or Security." Moreover, the Incident Reports reflect that the plaintiff yelled at and approached the locksmith when he entered the plaintiff's cell on March 22, 2018 to assess the security of the door. (*Id.*). Lieutenant Frenis was summoned to the plaintiff's cell to relocate the plaintiff to restrictive housing pending the outcome of the disciplinary report. (*Id.*) The plaintiff testified that, during the move, CO Fulton damaged some of his legal papers while packing them. However, the Incident Reports reflect that Lieutenant Frenis permitted the plaintiff to pack his belongings before he was taken to restrictive housing

without incident. (*Id.*). Deputy Warden Egan testified that the existence of an unlocked cell door, especially for the plaintiff, who is a High Security Status inmate, was a serious security concern that required corrective action through a roll call memo and through the Deputy Warden reinforcing the importance of "going back to basics" and checking cell doors regularly.

## 2.    PREJUDGMENT REMEDY STANDARD

A prejudgment remedy "is generally intended to secure the satisfaction of a judgment should plaintiff prevail." *Cendant Corp. v. Shelton*, No. 3:06 CV 854 (JCH), 2007 WL 1245310, at *2 (D. Conn. Apr. 30, 2007) (citation omitted). Federal Rule of Civil Procedure 64 permits a plaintiff to utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County*, 415 U.S. 423, 436, n.10 & 437 (1974); *Dill v. Ron's Golf Car Rental, Inc.*, No. 3:12CV137(JBA)(JGM), 2013 WL 275690, at *8 (D. Conn. Jan. 24, 2013). Pursuant to the Connecticut Prejudgment Remedy statute, CONN. GEN. STAT. § 52-278d(a), the standard for issuing a prejudgment remedy is probable cause, so that a prejudgment remedy is appropriate

> [i]f the court, upon consideration of the facts before it and taking into account any defenses, counterclaims or set-offs, claims of exemption and claims of adequate insurance, finds that the [movant] has shown probable cause that such a judgment will be rendered in the matter in the [movant's] favor in the amount of the prejudgment remedy sought . . . .

CONN. GEN STAT. § 52-278d(a).

A prejudgment remedy proceeding is "only concerned with whether and to what extent the plaintiff is entitled to have property of the defendant held in the custody of the law pending adjudication of the merits of that action." *Benton v. Simpson*, 829 A.2d 68, 72-73 (Conn. App. Ct.

2003) (citation & internal quotations omitted). Further, while a prejudgment remedy hearing "is not contemplated to be a full scale trial on the merits of the plaintiff's claim[,]" *Roberts v. Triplanet Partners, LLC*, 950 F. Supp. 2d 418, 421 (D. Conn. 2013) (citation & internal quotations omitted), a plaintiff is "bound to furnish proof of his damage with reasonable probability, and not leave the trial court to speculation and conjecture." *Mullai v. Mullai*, 468 A.2d 1240, 1242 (Conn. App. Ct. 1983)(*per curiam*).

The Court will "consider not only the validity of the plaintiff's claim but also the amount that is being sought." *Calfee v. Usman*, 616 A.2d 250, 254 (Conn. 1992) (citation & internal quotations omitted). "The Court's decision must be based on its appraisal of the legal issues and the credibility of the witnesses and other evidence." *Ensign Yachts, Inc. v. Arrigoni*, No. 3:09CV209(VLB), 2009 WL 4040394, at *4 (D. Conn. Nov. 19, 2009) (citations and internal quotation marks omitted). It is within this Court's "broad discretion to deny or grant a prejudgment remedy." *State v. Ham*, 755 A.2d 176, 178 (Conn. 2000). *See also Corey v. Hawes*, No. 3:14CV1266(JAM)(JGM), 2015 WL 5472507, at *7-8 (D. Conn. Sept. 17, 2015) (multiple citations omitted).

The plaintiff's application for prejudgment remedy turns upon whether the plaintiff has shown that there is "probable cause" that a judgment will enter in his favor. CONN. GEN. STAT. 52-278(d)(1)(A). As discussed above, the only determination that Court is making at this stage is whether the plaintiff has established probable cause. (Doc. No. 39 (bifurcating the Court's consideration of the PJR such that only the issue of whether the plaintiff has established probable cause that a judgment will be rendered in his favor, and any defenses, will be considered at this stage)); *see Balzer v. Millward*, Civ. No. 3:10CV1740(SRU)(HBF), 2011 WL 1547211, at *1 (D.

Conn. Apr. 21, 2011) (when evaluating probable cause, the court must "evaluate not only the plaintiff's claim but also any defenses raised by the defendant.").  Probable cause is defined as:

> a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it. Probable cause is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false.

*Qualitative Reasoning Sys., Inc. v. Computer Scis. Corp.*, No. 3:98CV554(AWT), 2000 WL 852127, at *10 (D. Conn. Mar. 31, 2000) (internal quotations & multiple citations omitted); *see also Walpole Woodworkers, Inc. v. Atlas Fencing, Inc.*, 218 F. Supp. 2d 247, 249 (D. Conn. 2002) (quoting *Three S. Development Co. v. Santore*, 474 A.2d 795, 796-97 (Conn. 1984) (citation omitted) (defining "probable cause" as "'a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it.'")).  The standard of "probable cause" is less demanding than the standards of "preponderance of the evidence" or the "likelihood of success." *Cendant Corp.*, 2007 WL 1245310 at *3 (citation omitted).  The plaintiff need not "prove its case by a preponderance of the evidence but must show that there is probable cause to sustain the validity of its claim." *Walpole Woodworkers*, 218 F. Supp. 2d at 249 (citation omitted).  The "'trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits.'" *Roberts*, 950 F. Supp. 2d at 421 (citations and internal quotations omitted).

### 3. COUNT ONE – UNLAWFUL INTIMIDATION AND RETALIATION (DILWORTH, EGAN, FRENIS, GRYKEN AND RAGAUSKAS)

To establish a retaliation claim, "'[t]he plaintiff bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff.'" *Harnage v. Brighthaupt*, 168 F. Supp. 3d 400, 412 (D. Conn. 2016) (quoting *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (additional citation omitted). "If a plaintiff carries that burden, the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct." *Graham*, 89 F. 3d at 79. Accordingly, the actions of the prison officials may still be upheld "if taken for both proper and improper reasons," if the action "would have been taken based on the proper reasons alone." *Id.* The plaintiff alleges that the officers retaliated against him for filing grievances, and "intimidated him to prevent [him] from" filing grievances. (Doc. No. 48 at 1).

There were two grievances offered into evidence at the PJR hearing. The first was filed on January 11, 2018, relating to the plaintiff's housing assignment as he had come in contact with CO Poma despite an active staff profile, and he felt he was being harassed by others with "specific references to" his profile with CO Poma. (Def.'s Ex. 517).

The second grievance, filed on February 20, 2018, related to the February 5th incident; the plaintiff complained about the "inappropriate and improper actions taken against [him] by [CO] Ragauskus that constitute[d]" sexual harassment. (Def.'s Ex. 515). The complaint alleges that the plaintiff's cell was shaken down and his cell door was shaken in a harassing manner in retaliation for his filing of the February 20, 2018 grievance. These are the only two incidents which post-date the February 2018 grievance.

It is clearly established that subjecting a prisoner to adverse action in retaliation for filing grievances constitutes unconstitutional conduct. *See Franco v. Kelly*, 854 F.2d 584, 589-89 (2d Cir. 1988). That said, the Court is cognizant of the "ease with which claims of retaliation may be fabricated," and thus, the Court must examine the plaintiff's claims of retaliation with "'skepticism and particular care[,]'" *Harnage*, 168 F. Supp. 3d at 413 (quoting *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)), while recognizing "that prison officials have broad administrative authority." *Graham*, 89 F.3d at 79. The Court's examination of the plaintiff's claims reveals that the evidence, as it has been presented thus far, relates to purported retaliation for the plaintiff's threatening of a correctional officer.

The activity that the plaintiff engaged in that led to the initial claim of harassment (as described in his January 11th grievance) was the threatening of CO Poma. Threatening a correctional officer does not constitute protected constitutional conduct. Additionally, there is evidence in the record that the conduct that the plaintiff engaged in that led to other alleged acts of retaliation consisted of refusing to comply with a verbal command and threatening staff on February 5, 2018. (*See* Def.'s Ex. 507-520).

As to the claim of retaliation related to the February 5th incident, it is undisputed that the initial DR for indecency issued by CO Ragauskas was dismissed after review. Even if the plaintiff's allegation that CO Ragauskas' DR was "false" and that it was issued in retaliation for grievances that the plaintiff filed, there is no evidence in the record of a grievance filed against CO Ragauskas prior to her issuing this DR, and the only grievance before the Court pre-dating this incident related to the plaintiff's complaints that he was being harassed for having threatened CO Poma. The plaintiff, therefore, has failed to establish that CO Ragauskas' alleged retaliatory behavior resulted from constitutionally protected conduct. Without satisfying this first prong, the

17

Court cannot find that the plaintiff has established probable cause that he will succeed on his retaliation claim as to the February 5th incident. *See HSqd, LLC v. Morinville*, No. 3:11CV1225(WWE), 2013 WL 5232557, at *7-8 (D. Conn. Sept. 17, 2013) (denying a prejudgment remedy when the plaintiff cannot establish the elements of a claim).

The plaintiff also appears to argue that the "false" DR by CO Ragauskas led to alleged excessive force by Lieutenant Frenis. But it is undisputed, through the plaintiff's own testimony and the Incident Reports from February 5, 2018, that, after Lieutenant Frenis arrived at the plaintiff's cell, the plaintiff ignored a direct order by him to come to the door to be handcuffed and transported to restrictive housing, and the plaintiff threatened Lieutenant Frenis. The officers on scene consistently noted the plaintiff's threatening behavior which would allow for the use of force employed by Lieutenant Frenis. It is unlikely that the plaintiff will be able to establish that the discipline rendered constituted retaliation, rather than discipline directly resulting from the plaintiff's own behavior.

The other alleged retaliatory and harassing conduct was the shaking of the plaintiff's cell door and the requirement that he be relocated from his cell. The evidence relating to these two claims demonstrated that the plaintiff altered the lock on his cell door, which ultimately required both the regular checking of the locking mechanism on his door and that he be relocated for the installation of a replacement lock.

The plaintiff alleges that CO Gryken "retaliated against [him] by shaking down [his] cell —and only [his] cell— on multiple occasions, damaging [his] personal property, by passing [him] a broken razor, and by denying [him] allotted time for recreation and access to the telephone[,]" and by "forc[ing] him to stand at his cell down at all times[.]" (Pl.'s Ex. A. ¶ 44). Other than asserting in his affidavit that CO Gryken harassed the plaintiff and retaliated against him for filing

grievances, the plaintiff offered no testimony or supporting documentary evidence involving CO Gryken during the PJR hearing, nor did he offer any evidence of damage to personal property. Accordingly, the plaintiff has not established probable cause that he will succeed on this aspect of the retaliation claim against CO Gryken.

Similarly, the plaintiff has not established probable cause that he will succeed on his retaliation claim relating to the alleged shaking of his cell door every time a correctional officer walked by his cell. As discussed above, the door was shaken regularly once it was discovered that the lock on the cell door was broken and had been broken for several days. (Def.'s Ex. 519). The Incident Reports reflect that there was "no evidence to substantiate" the plaintiff's allegation of retaliation, and, in fact, it was "substantiated that Baltas [had] tampered with the integrity of his door[,]" which is a violation of Administrative Directive 9.5, and for which the plaintiff received a Class A disciplinary report for "Interfering with Safety or Security." (Def.'s Ex. 519). The fact that the plaintiff's cell door was shaken regularly following the discovery that the cell door was unlocked was consistent with the policy to protect inmates and staff alike. Thus, the plaintiff has not established probable cause that this action constituted retaliation.[10]

### 4. COUNTS TWO AND THREE – EXCESSIVE FORCE AND DELIBERATE INDIFFERENCE (FRENIS)

The plaintiff alleges that Lieutenant Frenis' use of mace constituted an excessive use of force as "[a]t no time during the interaction between Frenis and [the] [p]laintiff prior to the former's discharge of [m]ace did [the] [p]laintiff constitute a risk to Frenis or any other Garner staff or

---

[10] The plaintiff alleges that, during the course of his relocation to restrictive housing, as required for receiving a Class A DR, CO Fulton damaged some of his legal papers in packing them. The plaintiff, however, does not seek the entry of a PJR against CO Fulton, and the Incident Reports reflect that Lieutenant Frenis permitted the plaintiff to pack his own belongings before he was taken to restrictive housing without incident, so there is no evidence to support the plaintiff's characterization of CO Fulton's alleged actions. (Def.'s Ex. 519).

inmate." (Doc. No. 21 at 10). Additionally, the plaintiff argues that Lieutenant Frenis' "action in delaying" access to medial treatment following the use of mace, constituted a deliberate indifference under the Eighth Amendment. (*Id.*).

The Supreme Court has acknowledged that "corrections officers must balance the need to maintain or restore discipline through force against the risk of injury to inmates[,]" and has embraced the "principle that [p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Hudson v McMillian*, 503 U.S. 1, 6 (1992) (citations and internal quotations omitted). Thus, the Court has held "that whenever prison officials stand accused of using excessive physical force in violation of [the Eighth Amendment], the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Id.* at 7 (citing *Whitley v. Albers*, 475 U.S. 312 (1986)).

The incident at issue arose when Lieutenant Frenis ordered the plaintiff to pack his belongings to go to segregation for engaging in alleged indecent behavior. The Incident Reports completed by Lieutenant Frenis, Lieutenant Maloid, CO Boucher, and CO Griffin all consistently reflect that, when the officers arrived to transport the plaintiff, he told Lieutenant Frenis that he would make him do this the "hard way[.]" (Def.'s Ex. 518 at 3-7). The plaintiff testified that he walked away from the door and began to pack his property. During his testimony, he acknowledged that Lieutenant Frenis told him to come to the door to "cuff up" and that he refused. The Incident Reports consistently reflect that the plaintiff "was given a direct order to place his hand [through] the trap to be cuffed up[,]" and he "refused and started to pack his property[.]" (Def.'s Ex. 218 at 6 (CO Griffin); *see* Def's Ex. 218 at 5 (CO Boucher reported that the plaintiff

"refused to comply with staff orders to be handcuffed."); *see* Def.'s Ex. 518 at 10 (CO Major reported that "[u]pon entering the unit[,] Inmate Baltas refused to comply with staff direct orders to cuff up."). The plaintiff appears to maintain that he was "pretty sure" he was told to pack his property and that, even if he disobeyed a direct order, the level of force that ensued was not justified.

Deputy Warden Egan testified, and all of the Incident Reports reflect, that the plaintiff was "defiant and agitated" and that he threatened to stab any staff member who entered his cell. (Def.'s Ex. 509; Def. Ex. 518 at 3-7, 10-11). The documentary and testimonial evidence before the Court is that the plaintiff, who has a history of threatening to harm staff, and who has made weapons in the past, threatened to stab any officer who came into his cell, ignored repeated orders and then made a "sudden movement" towards the toothbrush that Lieutenant Frenis believed had been altered into a weapon. Knowing the plaintiff's behavioral history, Lieutenant Frenis then deployed a chemical agent through the trap door. (Def.'s Ex. 518 at 3). When the plaintiff refused to comply, Lieutenant Frenis sprayed the chemical agent twice more, once when the plaintiff moved closer to the toothbrush and once after he warned the plaintiff that he would discharge again if the plaintiff did not comply. (Def.'s Ex. 518 at 3).

Pursuant to Administrative Directive 6.5, the defendants may utilize force for disobeying a direct order, such as coming to the door to be handcuffed, and force may be used in an "emergency situation to prevent significant injury to an inmate, another person, or damage to property that raises security concerns." (*See* Def.'s Ex. 501 at 2 (force may be used "to promote the safety of the public, staff and inmates[,]" and shall be used "when an inmate's behavior constitutes an immediate threat to self, others, property, order of the safety and security of the facility."); *see also* Def.'s Ex. 501 at 5 (physical force may be used in emergency circumstances)).

Deputy Warden Egan testified that the use of force deployed at the plaintiff's cell was in accordance with Administrative Directive 6.5, as Lieutenant Frenis' actions were taken in an "emergency" context. (*See* Def.'s Ex. 501 at 5).

Lieutenant Frenis stated in his Incident Report that, at the time, it was "unclear if [the toothbrush that he could see through the cell window] was sharpen[ed] or not[,]" (Def.'s Ex. 518 at 3), but upon examination after entering the cell, it was determined that the toothbrush was not sharpened into a weapon. The plaintiff pleaded guilty to the ticket for threatening to use the toothbrush to stab anyone who came into his cell that morning. (Def.'s Ex. 509).[11] The DOC District Office independently reviewed and upheld the use of force after reviewing three videos of the incident, concluding specifically that the deployment of the chemical agent was within the guidelines of the DOC. (Def.'s Exs. 501 & 518).

Additionally, the plaintiff's allegations regarding the alleged delay in medical care are countered by the evidence presented at the hearing. The plaintiff acknowledged that he was brought to the shower, and his head was placed under the running water to remove the chemical agent from his face. The plaintiff acknowledged that, following the decontamination of his eyes, and the controlled strip search, Lieutenant Frenis brought him to the medical unit where he received a nebulizer treatment for fifteen to twenty minutes. On cross examination, the plaintiff admitted that he was seen by both a nurse and a doctor. The records from this incident reflect that "UCONN Medical RN . . . conducted a post restraint check; noting no injuries to the wrists.

---

[11] According to the plaintiff, he added to his signature, "N.C.U.D." (no contest under duress), because he was told that he would remain in segregation and placed on chronic discipline if he did not plead guilty. (Def's Ex. 509 at 2). The "N.C.U.D.[,]" however, is crossed out on the document. (*See id.*). As the plaintiff testified regarding other incidents to which he pleaded guilty, the plaintiff "takes responsibility for the things [he] does."

UCONN Medical RN . . . also cleared inmate Baltas to be housed in restrictive housing. Following completion of incident RN . . . [an] additional assessment of inmate Baltas and for precautionary measures she requested inmate to be seen by Dr. Gerald Velletta in outpatient medical." (Def.'s Ex. 518 at 3). Dr. Velletta examined the plaintiff before he was released to restrictive housing. (*Id.*). Thus, the evidence presented at the PJR hearing does not establish probable cause that the plaintiff will succeed on his claim of deliberate indifference.

### 5. COUNT FIVE[12] – FAILURE TO SUPERVISE (DILWORTH, EGAN AND JONES)

In his Amended Complaint, the plaintiff alleges that Warden Dilworth and Deputy Wardens Egan and Jones "had been informed by [the] [p]laintiff of issues with the DRs, particularly regarding the multiple unsubstantiated DRs arising out of the incident on February 5[,]" but they did not issue a "profile" for CO Ragauskas and did not call the Connecticut State Police, thereby taking no action to secure the plaintiff's safety. (Doc. No. 21 at 11). Deputy Warden Egan conceded that it was an oversight to have allowed CO Poma to be in the same unit as the plaintiff on one occasion, given the existence of the separation profile between the plaintiff and CO Poma. As discussed above, and as the plaintiff testified, that profile existed only because the plaintiff threatened to stab CO Poma.

Following the February 5, 2018 incident, Warden Dilworth and Deputy Wardens Egan and Jones met with the plaintiff to address his concerns. The plaintiff requested a staff separation profile with CO Ragauskas and Lieutenant Frenis and claims that the failure to implement such profiles constituted a failure to supervise. As discussed above, the plaintiff pleaded guilty to the

---

[12] Count Six is a claim for common law battery against CO McGoldrick only. (Doc. No. 21 at 10). The plaintiff does not reference CO McGoldrick in his affidavit in support of his Application for Prejudgment Remedy, and, consequently, the motion was dismissed as to him. (Doc. No. 17).

DR for threatening Lieutenant Frenis, and the DOC District Office independently reviewed and upheld the use of force after reviewing three videos of the incident, concluding specifically that Lieutenant Frenis' deployment of the chemical agent was within the guidelines of the DOC. (Def.'s Exs. 501 & 518). After reviewing the video evidence of the incident for which CO Ragauskas issued a DR and finding it to be "inconclusive," that DR was dismissed. Deputy Warden Egan explained that the video did not capture the view into the plaintiff's cell that CO Ragauskas had, and, without conclusive evidence, the DR was dismissed. Additionally, upon discovering that the locking mechanism in the plaintiff's cell was not working, the door was repaired, and Deputy Warden Egan issued a roll call order reminding his officers to test the security of all of the cell doors to ensure the safety of the inmates and staff alike.

The actions of these defendants do not demonstrate a failure to supervise their staff or a disregard for the plaintiff's safety. The plaintiff has failed to satisfy his "low burden that probable cause exists that a judgment will enter" against these defendants on this count. *See Thompson v. Rizzitelli*, No. 3:10 CV 71 (JBA), 2011 WL 4899750, at *4 (D. Conn. Oct. 14, 2011) (denying the plaintiff's Application for Prejudgment Remedy due to the absence of evidence to support the plaintiff's claims).

6.    <u>COUNT SIX– DEPRIVATION OF DUE PROCESS OF LAW (EGAN AND JONES)</u>

In this count, the plaintiff contends that the "[d]efendants[ Egan and Jones'] seizure and examination of [p]laintiff's legal papers, beyond mere inspection of those papers for concealed contraband," deprived the plaintiff of his due process right under the Fourteenth Amendment. (Doc. No. 21 at 11). The plaintiff did not put forth any evidence of this claim at his hearing on the

Motion for Prejudgment Remedy, and, therefore, he has failed to establish probable cause supporting this count.

7.    COUNT EIGHT[13] – ATYPICAL AND SIGNIFICANT HARDSHIP (ALL DEFENDANTS)

The plaintiff alleges that, as a result of the "actions and failures to act of [the] [d]efendants," the plaintiff was "assigned to continuous restrictive housing placements," "which subjected him to atypical and significant hardship for many months[.]" (Doc. No. 21 at 11). As Deputy Warden Egan testified, housing the plaintiff was a "challenge" in light of his disciplinary history. As discussed above, the plaintiff's housing placements were the result of an extensive disciplinary history that included at least 62 disciplinary reports, his threats to staff, and his "multiple profiles" at all level four facilities in Connecticut, involving both staff and other inmates. The plaintiff's behavior has resulted in his transfer at least twelve times within the Connecticut DOC in less than five years (Def.'s Ex. 506) and, specifically, his transfer to, and placement in, administrative segregation multiple times over a 15-month period, between December 2016 and March 2018, which includes the time-period at issue in this case. (Def.'s Ex. 505). As discussed above, recently, the plaintiff was involuntarily transferred to a facility in Massachusetts due to his disciplinary history, his multiple profiles, "the difficulty managing him in a level 4 facility," and because he "poses a significant risk to the operation of [an in-State] institution." (*See* Def.'s Ex. 505). Thus, the plaintiff has not established probable cause that he will succeed on this claim.

8.    DAMAGES

---

[13] Count Seven is against CO Calderon. As discussed above, the plaintiff is not seeking a PJR against CO Calderon.

The damages that a plaintiff claims "need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." *Savalle v. Kobyluck*, No. 3:00CV675(WWE)(HBF), 2001 WL 1913746, at *2 (D. Conn. Sept. 12, 2001) (citation omitted). The plaintiff did not testify as to the value of any damages. Even if the plaintiff met his burden of establishing probable cause of success on the merits of his claims, there is no evidence to suggest that he could recover damages against any of the defendants in the amount of $100,000 per defendant.[14]

### 9.    DEFENDANTS' QUALIFIED IMMUNITY DEFENSE

The defendants contend that "they did not violate any constitutional right of the plaintiff and are entitled to qualified immunity." (Doc. No. 49 at 8); *see Balzer*, 2011 WL 1547211, at *1 (the Court must "evaluate not only the plaintiff's claim but also any defenses raised by the defendant."). The plaintiff argues that the evidence presented "shows the [d]efendants stepping out of their official capacities to intentionally and unlawfully suppress complaints regarding policies and personnel, and to their abuse of their positions of trust." (Doc. No. 48, at 7).

"A federal official is entitled to qualified immunity from suit for money damages unless the plaintiff shows that the official violated a statutory or constitutional right, and that the right was clearly established at the time of the challenged conduct." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citation and internal quotations omitted). "So long as a defendant has an objectively reasonable belief that his actions are lawful, he is entitled to qualified immunity."

---

[14] If the plaintiff were to receive a judgment in his favor, the State of Connecticut has an interim lien for repayment of the plaintiff's cost of incarceration. Conn. Gen. Stat. § 18-85b; *see Cordero v. Univ. of Conn. Health Ctr.*, 61 A.3d 514 (Conn. 2013) (holding that the state recovery of public assistance payments from the proceeds of a beneficiary's cause of action is capped at 50% of the proceeds less deductions when cause of action is against the state). As of January 4, 2019, the State's interim lien was for $886,250.00 for "costs of incarceration or fifty percent (50%) of the lawsuit or settlement money after certain expenses, including attorney's fees, expenses of suit and medical expenses . . . are paid, whichever is less." (Def.'s Ex. 504); *see* Conn. Gen. Stat. § 18-85b.

*Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) (citation and internal quotations omitted). Qualified immunity is an affirmative defense that is "ordinarily pleaded by way of an answer[,]" or asserted in support of a motion to dismiss under Rule 12(b)(6). *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004). Thus, even if the low standard of probable cause was met as to any of the foregoing claims, the existence of this defense weighs against the imposition of a prejudgment remedy against these defendants, as a valid defense would defeat a finding of probable cause. *TES Franchising LLC v. Feldman*, 943 A.2d 406, 413 (Conn. 2008) (citations omitted); *id.* (Section 52-278(d) "requires only that the trial court *take into* account any defenses and counterclaims.") (emphasis in original).

## III.  CONCLUSION

Based on the evidence presented, the Court cannot find probable cause that judgment would enter in the plaintiff's favor against any of these defendants in the amount of $100,000 per defendant. Accordingly, the plaintiff's Application for Prejudgment Remedy (Doc. No. 1-2) is DENIED. In light of this conclusion, the plaintiff's Motion for Disclosure of Assets (Doc. No. 1-5) is DENIED AS MOOT.

This is not a Recommended Ruling.[15] This is an order reviewable pursuant to the "clearly erroneous" statutory standard of review. *See* 28 U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); and D. Conn. L. Civ. R. 72.2. As such, it is an order of the Court unless reversed or modified by the district judge upon timely made objection.

---

[15] A PJR application is a non-dispositive motion, and upon referral to a Magistrate Judge, does not require a recommended ruling. *Aetna Life Ins. Co. v. Tooth Savers Dental Serv.*, No. 3:96CV102453(GLG), 1997 WL 102453, at *1 (D. Conn. Feb. 5, 1997). *See also Doe v. Bruno*, 3:17CV217(JAM)(JGM), 2017 WL 1424298, at *4, n. 3 (D. Conn. Apr. 20, 2017); *Lafarge Bldg. Materials, Inc. v. A. Aiudi & Sons, LLC*, 3:15CV1203(JBA)(JGM), 2015 WL 6551796, at *8, n. 19 (D. Conn. Oct. 29, 2015); *CapitalSource Fin. LLC v. Autorino*, 3:09CV2148(RNC)(DFM), 2011 WL 1195857, at *1, n. 1 (D. Conn. Mar. 11, 2011); *United of Omaha Life Ins. Co. v. Conn. Student Loan Found'n*, 718 F. Supp. 2d 277, 286 (D. Conn. 2010).

Dated this 10th day of April, 2019 at New Haven, Connecticut.

/s/Robert M. Spector, USMJ
Robert M. Spector
United States Magistrate Judge