### UNITED STATES DISTRICT COURT
### DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JOE BALTAS** | : | |
| **Plaintiff,** | : | |
| | : | **No. 18-CV-1168 (VLB)** |
| **v.** | : | |
| | : | |
| **PAUL FRENIS, CORRECTIONAL** | : | **August 22, 2023** |
| **OFFICER RAGAUSKAS,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **STEPHANIE GRYKEN, WARDEN** | : | |
| **DENISE DILWORTH, DEPUTY** | : | |
| **WARDEN DAVID EGAN, DEPUTY** | : | |
| **WARDEN KIMBERLY JONES,** | : | |
| **COUNSELOR SUPERVISOR** | : | |
| **MICHAEL CALDERON,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **LEFEVRE, CORRECTIONAL** | : | |
| **OFFICER PERALTA,** | : | |
| **CORRECTIONAL OFFICER GUEST,** | : | |
| **CORRECTIONAL OFFICER** | : | |
| **MCGOLDRICK, LPC ANDRADE,** | : | |
| **Defendants.** | : | |
| | : | |

### DECISION GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DKT. 194]

When Joe Baltas was housed at Garner Correctional Institution in 2016, he threatened to stab a correctional officer, resulting in a separation profile against that officer. Multiple Department of Correction ("DOC") staff members were present for that incident. He was eventually transferred to another prison but returned in November 2017. Shortly after, he encountered the officer he previously threatened and asked DOC to enforce the separation profile. Baltas alleges that DOC staff began to retaliate against him. On February 5, 2018, Officer Ragauskas cited Baltas for public indecency. When DOC staff attempted to take him to the

Restricted Housing Unit ("RHU"), Lieutenant Paul Frenis pepper-sprayed him, resulting in his need for medical attention.

Baltas brings this action against 12 Defendants, all in their individual capacities:  Defendants Warden Denise Dilworth and Deputy Wardens David Egan and Kimberly Jones (collectively, "Supervisory Defendants"); Lieutenant Paul Frenis; Correctional Officers Ragauskas, Stephanie Gryken, LeFevre, Peralta, Guest, McGoldrick; Counselor Supervisor Michael Calderon; and "LPC" Andrade. He alleges eight counts of unlawful intimidation and retaliation in violation of his First Amendment rights against all defendants except Defendants Jones and McGoldrick (Count One); excessive force and deliberate indifference in violation of his Eighth Amendment rights against Lieutenant Frenis (Counts Two and Three); common law battery against Officer McGoldrick (Count Four); failure to supervise and protect against the Supervisory Defendants (Count Five); deprivation of due process of the law in violation of the Fourteenth Amendment against Defendants Egan, Jones and Calderon (Counts Six and Seven); and subjection to atypical and significant hardship in violation of the Fourth, Eighth, and Fourteenth Amendments (Count Eight).  For the following reasons, the Court DENIES summary judgment on Counts One, Two, Four through Six, and Eight; GRANTS summary judgment as to Count Three; and DISMISSES Count Seven, because Baltas requests to litigate that claim in *Baltas v. Jones et al.*, 21-cv-00469 (MPS).

I.    Background

   A.    *Facts*

In support of their Motion for Summary Judgment, (Dkt. 194), Defendants submitted video evidence under seal (Dkt. 194-3, Mot. Summ. J. Ex. A), declarations from Defendants Frenis and Ragauskas (Dkt. 194-4, Mot. Summ. J. Ex. B; Dkt. 194-5, Mot. Summ. J. Ex. C), Administrative Directive 9.4 (Dkt. 194-6, Mot. Summ. J. Ex. D), and Lieutenant Frenis' Incident Report regarding the events that took place on February 5, 2018 (Dkt. 194-7, Mot. Summ. J. Ex. E).  For reasons explained in the Procedural History section, *infra* at I.B., the Court gave Defendants the opportunity to supplement the summary judgment motion.  Defendants submitted additional briefing but did not file any evidence.  (*See* Dkt. 216, Supp.)

Baltas submitted nearly 200 pages of exhibits for the Court's consideration. (*See* Dkt. 241-3, Pl.'s Opp'n Exs. 1–30.)  In summary, they include his declaration, complaints, statements and grievances (*id.* at Ex. 1 & Attach., 16, 18, 25); videos (*id.* at Exs. 2, 4–7, 13, 15, 21–24, 27–29); DOC staff incident reports and disciplinary reports (*id.* at Exs. 3, 8, 9, 14, 26, 30); dismissals of certain disciplinary reports (*id.* at Ex. 10, 17); Administrative Directives 6.5 and 6.12 (*id.* at Exs. 11, 19); a pepper spray data sheet (*id.* at Ex. 12); and an affidavit from another inmate in the RHU (*id.* at Ex. 20).

The following facts are taken from the Local Rule 56 statements of material facts and evidence cited by the parties.[1]  The facts are read in the light most

---

[1] The Court cites Plaintiff's Local Rule 56(a)(2) Statement for all facts deemed admitted. Otherwise, the Court cites directly to the Exhibits.

favorable to the non-movant, Joe Baltas.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

### 1.    Baltas' First Period of Incarceration at Garner

On December 13, 2016, while housed in Garner's E-unit, Baltas was involved in an incident that resulted in his discipline and ultimate transfer.  (*See* Dkt. 241-3 Ex. 3.)  Baltas submitted a sworn declaration in which he stated, "staff were attemp[t]ing to escort me to RHU for a verbal threat, at which time I did threaten to make a shank and stab an officer in the neck."  (*Id.* at Ex. 1 ¶ 2.)  The name of the officer he threatened is Jason Poma.  (*Id.* ¶ 4.)  The incident report provides the details of the event.  (*See id.* at Ex. 3.)  Baltas admits that the DOC staff properly followed protocol in this incident.  (*Id.* at Ex. 1 ¶ 2.)  According to Baltas, this event resulted in a separation profile with Officer Poma.  (*See id.* ¶ 4.)

### 2.    Baltas Returns to Garner

At some point, Baltas was transferred to a different DOC institution.  He returned to Garner around November 2017.  (*See id.*)  Shortly after, Officer Poma entered his housing unit "in violation of policy" and "made threatening acts and gestures" toward Baltas.  (*Id.*)  Baltas stated, "I reported the misconduct to my unit manager, [Warden Dilworth and] Deputy Wardens Egan and Jones, who assured me they would file the appropriate paper work and I would not come into contact with Poma again."  (*Id.*)  However, after his complaint, other staff—including Defendants Frenis, Ragauskas, Gryken, and LeFevre—began to harass and threaten him.  (*See id.* ¶¶ 5–7.)

4

Attached to Baltas' declaration are several documents: an Inmate Request Form dated December 15, 2017, requesting a transfer due to staff harassment; an Inmate Administrative Remedy Form ("Remedy Form") dated January 11, 2018, stating he never received a response to the former; and several excerpts from subsequent Remedy Forms, dated February 20 and 25, 2018, establishing his requests were denied.  (*See id.* at Ex. 1 Attachs. A–E.)  In the Remedy Form dated January 11, 2018, Baltas explains that he is afraid of "risk of harm"; he has come into contact with an officer listed on an active staff profile; that his "personal safety has been threatened by staff, with specific references" to Officer Poma; that he feels unsafe; and that he requests a transfer.  (*Id.* at Attach. B.)  Warden Dilworth denied this request, stating: "Final determination for housing is at the discretion of population management.  There is no evidence of staff being unprofessional nor specific issues cited.   Your safety is not at risk, staff are expected to be professional, unsubstantiated."   (*Id.*)   Warden Dilworth signed this denial on February 21, 2018.  (*See id.*)

### 3.      February 5, 2018

After Baltas submitted his Remedy Form and before Warden Dilworth denied it, Baltas was involved in an altercation in which Lieutenant Frenis pepper-sprayed him.  The record includes incident reports, video footage of the event, surveillance video footage, and Baltas' subsequent grievances from this event.

Late morning on February 5, 2018, Officer Ragauskas passed by Baltas' cell in E-Unit.  (Dkt. 246-1, Local 56(a)(2) Stmt. & Mem. ¶ 6.)[2]  Officer Ragauskas claims that she observed him "touching his genitalia in a sexual manner."  (Dkt. 241-3 Ex. 9.)  She notified Lieutenant Frenis, the shift supervisor on duty.  (*See id.*; Dkt. 246-1 ¶ 4.)  Officer Ragauskas filed an Incident Report of this event.  (Dkt. 241-3 Ex. 9.)

Lieutenant Frenis approached Baltas' cell with "a secondary supervisor … along with escorting staff."  (*Id.*)  According to Lieutenant Frenis, Baltas denied masturbating in front of Officer Ragauskas, refused to submit to being restrained, and threatened to stab staff with a toothbrush if they enter his cell.  (*Id.*)  Other DOC submitted incident reports confirming Baltas threatened to stab staff.  (*See id.*)  Baltas denies making this threat.  (Dkt. 246-1 ¶ 20.)

The video footage begins at 12:11 am on February 5, 2018.  (*See* Dkt. 241-3 Ex. 5.)  For the first five minutes, Baltas' door is closed and Lieutenant Frenis communicates with him through the closed door with six officers standing around the door.  Lieutenant Frenis informs Baltas he is going to be escorted to the RHU due to public indecency.  (*See id.* at 00:26–03:50.)  Baltas denies the allegations.  Baltas argues with Lieutenant Frenis about whether Officer Ragauskas could have seen him from her vantage point.  (*Id.*)  Around minute 4, Baltas speaks but the content is unintelligible on the video.

Lieutenant Frenis then orders the trap door to be opened, and he places his hand through the trap door while holding a chemical agent.  During this portion of

---

[2] Docket number 246-1 contains both Baltas' Local 56(a)(2) Statement and memorandum of law.  Citations to paragraphs refer to the Local 56(a)(2) Statement, and citations to page numbers refer to the memorandum.

the video, Lieutenant Frenis deploys the chemical agent multiple times.  Exactly when Lieutenant Frenis first uses the chemical agent is unclear.  Also during this portion of the video, Lieutenant Frenis states, "Drop the weapon" and Baltas clearly asks, "Drop *what* weapon?"  (*Id.* at 04:19–23.)  Shortly after deploying the chemical agent, Lieutenant Frenis states aloud—with his back to the camera but his head turned so his speech is intelligible—that Baltas "says he has a sharpened toothbrush."  (*Id.* at 04:29.)

At minute 5, Baltas places his hands through the trap door so he can be handcuffed.  (*Id.* at 5:05–21.)  Once an officer handcuffs Baltas, another officer opens the door. (*Id.*)  Baltas then exits the cell and is escorted to the RHU.[3]  (*Id.* at 05:29–07:35; Dkt. 246-1 ¶ 36.)  Upon arrival at the RHU, the officers place Baltas in the shower with his clothes on.  (Dkt. 241-3 Ex. 5 at 07:35.)  Lieutenant Frenis instructs Baltas to open his eyes and blink.  (*Id.*)  Approximately 30 seconds later, the officers remove Baltas from the shower and place him in the RHU cell.  (*See id.* at 8:08–15.)  When in the new cell, Baltas is strip searched and his handcuffs are removed without incident.  (*Id.* at 8:15–10:35; Dkt. 246-1 ¶ 36.)  The video ends at 12:25 pm.  (Dkt. 241-3 Ex. 5 at 10:35.)

Lieutenant Frenis' incident report indicates that, once secured in the RHU cell, DOC staff gave Baltas a clean red jumpsuit, white t-shirt, boxers, socks, bed roll, and mattress.  (*Id.*)  UConn medical staff conducted a post-restraint check, cleared him to be housed in the RHU, and referred him to be seen by Outpatient Medical ("OPM.")  (*Id.*)

---

[3] It is undisputed that inmates placed in administrative detention status are housed in the RHU.  (Dkt. 246-1 ¶ 11.)

Within 15 minutes of Baltas' placement in the RHU, Lieutenant Frenis returned with staff to bring Baltas to OPM to be evaluated by a physician.  (Dkt. 246-1 ¶ 41.)  Upon arrival at OPM, a physician gave Baltas a breathing treatment. He was later escorted back to the RHU without further incident.  (*Id.* ¶ 44.)  These escorts were recorded on video.  (*Id.* ¶¶ 42, 45.)

### 4.      Dismissals of Incident Reports

Ten days later, Baltas received a disciplinary hearing concerning Officer Ragauskas' public indecency allegation against him and the events that flowed from it.  (Dkt. 246-1 ¶ 50.)  All charges were dismissed.  Specifically, the hearing officer dismissed the public indecency charge for lack of evidence.  (*Id.*; *see* Dkt. 241-3 Ex. 10.)  The officer also dismissed the charge of disobeying a direct order— which resulted in his exposure to a chemical agent—for lack of evidence.  (*See id.*) As for another disciplinary report submitted 24 hours after the incident, it was dismissed due to a process failure.  (*Id.*)

### 5.      Alleged Retaliation

On March 22, 2018 at approximately 10:00 am, Baltas was charged with interfering with safety or security.  Correction Maintenance Officer Locksmith Meady submitted a disciplinary report indicating he "was tasked to assess the security of the door and hinges" on Baltas' cell, that Baltas yelled at him to leave, that he closed and secured the door, and that he notified Lieutenant Frenis.  (*Id.* at Ex. 14.)  The incident report indicates that Lieutenant Frenis authorized administrative detention and that Officer Ragauskas delivered the disciplinary report to Baltas at 11:40 am.  (*Id.*)

8

At 2:30 pm, Baltas submitted a voluntary inmate statement indicating that, after the February 5 incident, Lieutenant Frenis began to harass him.  (*Id.* at Ex. 16.)  Specifically, Baltas reported that "upon every tour he shakes my door violently & proceeds to have maintenance come & work on my door in order to harass & inconvenience me."  (*Id.*)  He claimed these events happened one time (on an unspecified date) and then "again" on March 16, 19, and 22.  (*Id.*)  Baltas stated, "Lt. Frenis subsequently entered the unit, came to my cell & 'dared me to give him a reason to fuck me up again.'"  (*Id.*)  Then Lieutenant Frenis turned on the camera and escorted him to the RHU.  (*See id.*)  Baltas also stated, Officer Ragauskas "delivered the [disciplinary report] & whispered to me that they would continue to 'fuck with me until I killed myself.'"  (*Id.*)  In this inmate statement, Baltas requested charges be pressed against Lieutenant Frenis and Ragauskas for threats and harassment.  (*Id.*)

Less than a month later on April 12, Officer LeFevre issued Baltas a disciplinary report for masturbating in public.  (*Id.* at Ex. 14.)  The record does not indicate how the disciplinary report was resolved.

In May 2018, while housed in the RHU, Baltas submitted two documents entitled, "Statement of Fact – PREA."  (*Id.* at Exs. 18 & 25.)  In the Statement of Fact, Baltas described an incident in which he claims LPC Andrade improperly conducted a second tour where she claims to have seen him "fully exposed."  (*Id.* at Ex. 18.)  He describes her conduct as "sexual abuse via voyeurism."

The second Statement of Fact describes allegations of retaliation flowing from Baltas' initial PREA complaint.  (*Id.* at Ex. 25.)  Baltas alleges that LPC Andrade

entered the RHU on May 24, 2018, and, while standing on the top tier of the unit, threatened him that she would make his "life hell."  (*Id.*)  Marcus Mahoney, an inmate who was housed in the RHU near Baltas, submitted an affidavit in which he attests to hearing LPC Andrade's comment.  (*Id.* at Ex. 20 ¶ 5.)

According to Baltas' second Statement of Fact, on May 25, 2018 Baltas complained to Lieutenant Tolmic about LPC Andrade's threats.  (*Id.* at Ex. 25.)  He was told LPC Andrade was not assigned to the unit that night and would also be instructed not to enter the unit.  (*Id.*)  Yet that evening, LPC Andrade entered with "LPC Sanders."  (*Id.*)  The latter asked him if he was "doing PREA shit, right?!"  (*Id.*)  LPC Andrade then filed multiple false disciplinary reports for public masturbation.  (*Id.*)

On May 26, 2018, LPC Andrade entered the RHU with a correctional officer escort, and she "stated loudly, 'That's why I got you five tickets.'"  (*Id.*)  Mahoney heard her make this comment.  (*See id.* at Ex. 20 ¶ 8.)  Baltas complained, but LPC Andrade kept appearing in the RHU despite being instructed not to do so.  (*Id.*)  Baltas' allegations are noted in an Incident Report filed by Lieutenant Rinaldi on behalf of Baltas.  (*Id.*)  Deputy Warden Egan determined the allegations to be "unsubstantiated."  (*Id.* at Ex. 26.)

There is evidence of several disciplinary reports from May 25, 2018.  The <u>first</u> was for "destruction of property" in which  Officer Peralta  found an allegedly torn sheet and torn laundry bag filled with water in Baltas' cell, supposedly to make a weight.  (*See id.*)  This was dismissed for lack of evidence.  (*Id.*)  Mahoney attested to observing Officer Peralta   enter Baltas' cell, throw property around on the

ground, stamp on it, and—upon exiting the cell with a water bag—telling other officers he "fucked that shit up" amidst laughter.  (*Id.* at Ex. 20 ¶ 6.)

The <u>second</u> was for "interference with safety and security" because Baltas refused to remove his hands from the cell's trap door until he was given the opportunity to speak with Captain Hurdle about who searched his cell.  (*Id.* at Ex. 26.)  He later pleaded guilty to this disciplinary report.  (*Id.*)

The <u>third</u> was for "threats" in which Officer Guest alleged Baltas stated, "Me and Captain Hurdle have an agreement to not have my cell searched by you CO's to keep me from hurting you mutha fuckers."  (*Id.*)  Officer Guest further stated Baltas threatened to hurt other officers.  (*Id.*)  This disciplinary report was dismissed for lack of evidence.

The <u>fourth</u> was for "public indecency," but this too was dismissed for lack of evidence.  (*Id.*)

The evidence also includes three disciplinary reports from May 30 and 31, 2018 regarding Baltas using threats and derogatory language, but these too were dismissed for lack of evidence.  (*Id.*)  Mahoney attested to being "interviewed" in the office by the "DW and DR" who told him to stop assisting Baltas and threatened to say he was lying.  (*Id.* ¶ 9.)  Mahoney observed "DWs Egan and Jones go into the office and go through Joe's property, including his legal paperwork."  (*Id.* ¶ 10.)

On June 3, 2018, Baltas and Officer McGoldrick got into an argument. Mahoney attests that Officer McGoldrick "became enraged and began to slam the sliding door on the food trap [door] on Joe's hand, multiple times."  (*Id.* ¶ 11.)

Baltas submitted photographs from a Physical Evidence Form, but the images are nearly impossible to decipher.  (*See id.* at Ex. 30.)

### B. *Procedural History*

Baltas filed this action on July 16, 2018.  (Dkt. 1; Dkt. 246-1 ¶ 1.)  When he initiated this lawsuit, he was represented by counsel, Andrew Marchant-Shapiro. He amended his complaint on November 26, 2018.  (Dkt. 21.)

Exactly one year later, Attorney Marchant-Shapiro moved to withdraw as plaintiff's counsel, citing a breakdown of communication and trust related to the discovery process.  (Dkt. 74.)  The Court denied this motion after Baltas responded and indicated his desire to continue the attorney-client relationship.  (Dkt. 77.)  The October 2020 discovery deadline came and went.  (Dkt. 92.)

Neither party filed a summary judgment motion by the November 1, 2020, deadline.  (*See id.*)  The parties jointly requested and were referred for a settlement conference.  (Dkts. 104 & 105.)  Settlement conferences were conducted over a series of nine months, but the case did settle.  The JTM deadline was set for September 2, 2021, (*see* Dkt. 159), but the parties did not timely file a JTM.

On September 26, 2021, the Court dismissed the case without prejudice to moving to reopen and establishing good cause for the failure to file.  (*See* Dkt. 164.) The parties thereafter moved to reopen and filed a JTM on November 10, 2021.  (Dkt. 168.)  This JTM narrowed the number of counts and defendants to the following: (1) Count One, unlawful intimidation and retaliation against Defendants Frenis and Ragauskas; (2) Count Two, excessive force against Lieutenant Frenis; (3) Count Three, deliberate indifference against Lieutenant Frenis; and (4) Count Five, failure

to supervise and protect Baltas against Deputy Wardens Dilworth, Egan and Jones. (*See id.*)  The JTM did not include nine out of 11 Defendants in Count One, nor did it include Counts Four, Six through Eight.

The Court took the motion to reopen under advisement, scheduling a teleconference to take place on January 12, 2022, and tentative jury selection for April 19, 2022.  (Dkt. 176.)  The week before the hearing, Attorney Marchant-Shapiro moved to withdraw a second time.  (Dkt. 181).  This time, the Court granted the motion.  (Dkt. 182.)  However, the Court directed Attorney Marchant-Shapiro to appear for the teleconference, (*id.*), during which it appointed Attorney Marchant-Shapiro as standby counsel, (*see* Dkt. 184).  Also at the teleconference, the Court permitted defense counsel to file a summary judgment motion to narrow the trial issues.  (*Id.*)

On January 24, 2022, Baltas moved to reinstate the claims and Defendants that were dropped from the JTM.  (Dkt. 192.)  Two days later, Defendants filed their Motion for Summary Judgment, which only addressed the Counts and Defendants in the JTM.  (Dkt. 194.)  The Court thereafter permitted defense counsel to supplement the summary judgment briefing to address all Counts and Defendants in the operative pleading.  (Dkt. 207.)  Defendants did so, (Dkt. 216), and summary judgment has since been fully briefed (Dkts. 241, 244, 246, 248).

During the pendency of this motion, all of Baltas' pending cases were referred to Magistrate Judge S. Dave Vatti for global settlement on December 8, 2022.  (Dkt. 282.)  Judge Vatti presided over settlement discussions for months before the cases ultimately failed to reach a resolution.  (Dkt. 292.)  After significant

time and a complicated procedural history, this summary judgment motion is now ready for a ruling.

II.   **Legal Standard**

When filing a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

If a motion for summary judgment is supported by documentary evidence and sworn affidavits which demonstrate "the absence of a genuine issue of material fact," the nonmoving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted); *see also Welch-Rubin v. Sandals Corp.*, No. 3:03cv481, 2004 WL 2472280 (D. Conn. Oct. 20, 2004). Thus, the party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Robinson*, 781 F.3d at 44.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record

14

. . . ; or **(B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."** Rule 56(c)(1). In reviewing the record, the Court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in its favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). The Court may not, however, "make credibility determinations or weigh the evidence. . . . [because] [c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 607–08 (2d Cir. 2017) (internal quotation marks and citations omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, however, summary judgment is improper. *See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

Where one party is proceeding *pro se*, the Court reads the *pro se* party's papers liberally and interprets them "to raise the strongest arguments that they suggest." *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (internal quotation marks and citation omitted). Despite this liberal interpretation, however, allegations unsupported by admissible evidence "do not create a material issue of fact" and cannot overcome a properly supported motion for summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

III.     **Discussion**

    A.     *Claims Against Supervisory Defendants*

Defendants argue that summary judgment should be granted on all Counts against the Supervisory Defendants—i.e., Counts One against Defendants Dilworth and Egan, Counts Five and Eight against all three Supervisory Defendants, and Count Six against the Deputy Wardens—because Baltas cannot prove these individuals were personally involved under the standard established in *Tangreti v. Bachmann*, 923 F.3d 609 (2d Cir. 2020). (Dkt. 194 at 4–9.) Baltas argues that he informed the Supervisory Defendants when he was first threatened and harassed by staff, including writing a Request to Warden Dilworth . (Dkt. 246-1 at 13.) He argues that he continued to report false disciplinary reports, harassment, abuses and violations of his rights, but they did nothing. (*Id.*) This includes their failure to separate him from LPC Andrade after he made a PREA complaint against her, in violation of Administrative Directive 6.12. (*Id.* at 14.) He also argues the Supervisory Defendants ordered his legal work "removed from him" and that they attempted to silence others who came forward. (*Id.*) Defendants address Baltas' assessment of supervisory liability in their Reply but did not submit any evidence.

The Court denies summary judgment as to all counts concerning Defendants Dilworth, Egan and Jones. While Defendants have briefed the legal standard for evaluating supervisory liability, they have not submitted any evidence concerning any of the Counts involving the Supervisory Defendants. (*See* Dkt. 194-9, Defs.' 56(a)1 Stmt.) As Federal Rule of Civil Procedure 56 makes clear,

> A party asserting that a fact cannot be … genuinely disputed **must** support the assertion by: (A) **citing to particular parts of materials in**

16

**the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the … presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.**

Fed. R. Civ. P. 56(c) (emphases added).   By failing to point the Court to any evidence whatsoever, Defendants have not met their burden at summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact.") (emphasis added); *Andrea Doreen Ltd. v. Bldg. Material Loc. Union 282*, 299 F. Supp. 2d 129, 138 n.11 (E.D.N.Y. 2004) (stating the "failure to designate specific support in the record is fatal at the summary judgment stage").   Therefore, summary judgment is DENIED as Counts One against Defendants Dilworth and Egan, Counts Five and Eight against all three Supervisory Defendants, and Count Six against the Defendants Egan and Jones on the grounds they were not personally involved.

> **B.** *Count One: Unlawful Intimidation and Retaliation Against Non-Supervisory Defendants*

To prevail on a First Amendment retaliation claim, a plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019).   Protected speech or activity includes filing a lawsuit, an

administrative complaint, or a prison grievance.  *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015) ("It is well established that retaliation against a prisoner for pursuing a grievance violates the right to petition [the] government for the redress of grievances guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.") (internal quotation marks and citations omitted); *Booth v. Comm'r of Corr.*, No. 3:19-cv-00100 (MPS), 2019 WL 919580, at *5 (D. Conn. Feb. 25, 2019) ("Filing complaints and grievances is protected activity.") (citation omitted).  "An adverse action is defined as 'retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" *Brandon*, 938 F.3d at 40 (quoting *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003)). In order to allege causation, the inmate must state facts "suggesting that the protected conduct was a substantial or motivating factor in the [defendant's] decision to take action against [him]." *Moore v. Peters*, 92 F. Supp. 3d 109, 121 (W.D.N.Y. 2015).

As the operative complaint alleges, the gist of this retaliation claim is as follows.  Non-supervisory Defendants Frenis, Gomes, Gryken and Guest threatened Baltas that they would retaliate against him for filing grievances.  (Dkt. 21 ¶ 83.)  On February 5, 2018, Officer Ragauskas filed a disciplinary report that he masturbated in front of her.  (*Id.* ¶ 36.)  This disciplinary report led to Lieutenant Frenis' use of pepper spray as he and other officers sought to transfer Baltas to restricted housing.  (*See id.* ¶¶ 36–43.)  As a result of this incident, Defendants filed disciplinary reports against Baltas for "public indecency," "disobeying a direct order" and "threats."  (*Id.* ¶¶ 43, 45.)  In the months that followed, Defendants

Gryken, Frenis, Calderon, Lefevre, and Andrade continued this harassment by staring him down, shaking his cell door, threatening to cause him physical harm, issuing more disciplinary reports against him, and designating him "chronic discipline status." (*Id.* ¶¶ 84–85.) Baltas' disciplinary reports were dismissed as unsubstantiated. (*See* Dkt. 241-3 Ex. 10.)

Defendants are correct that courts treat prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." *Dorsey v. Fisher*, 468 F. App'x 25, 27 (2d Cir. 2012) (citation omitted). But that does not negate Defendants' requirement to provide the Court with evidence showing entitlement to summary judgment. *See* Fed. R. Civ. P. 56(c). Defendants' evidence hardly addresses Baltas' detailed allegations.

As an initial matter, Defendants have failed to provide the Court with any evidence challenging Baltas' allegations that Defendants threatened him, filed disciplinary reports against him, and harassed him—either before or after February 5, 2018. In the absence of providing any evidence concerning the claims against Defendants Andrade, Calderon, Dilworth, Egan, Gomes, Gryken, Guest, LeFevre, Peralta, and Ragauskas, the Court DENIES summary judgment as to them. *See Bennett v. Goord*, 343 F.3d 133, 139 (2d Cir. 2003) (concluding prison was not entitled to summary judgment because it "essentially treated its own motion for summary judgment as one to dismiss the complaint, contesting only the sufficiency of [plaintiff's] allegations").

The only evidence Defendants submitted is related to Lieutenant Frenis. Namely, Defendants argue that "the disciplinary reports that defendant Frenis issued the plaintiff for 'threats' and 'disobeying a direct order' were based entirely on the plaintiff's own conduct on February 5, 2018, when defendant Frenis arrived at Echo Unit to transport him to RHU." (Dkt. 194-1 at 21.)  They rely exclusively on evidence limited to the incidents on February 5, 2018, i.e. the video showing Lieutenant Frenis' use of pepper spray and his declaration explaining the circumstances of that event.[4]  (*See* Dkt. 194-1 at 14–21; Dkt. 216 at 1–7; Dkt. 244 (not addressing retaliation).)  This argument fails to consider the broader set of facts: that Lieutenant Frenis had previously threatened Baltas, that Lieutenant Frenis continued to threaten him after the February 5 incident, and that Lieutenant Frenis' disciplinary reports were dismissed.  *See Lashley v. Wakefield*, 367 F. Supp. 2d 461, 468 (W.D.N.Y. 2005) (denying summary judgment where "there was insufficient evidence to support the charges against plaintiff" and defendant made "retaliatory statements" against the plaintiff); *Baltas v. Maiga*, No. 3:20cv1177 (MPS), 2022 WL 3646199, at *15 (D. Conn. Aug. 24, 2022) ("A plaintiff may demonstrate the necessary causal connection between the adverse action and the protected conduct or speech through circumstantial evidence, including the temporal proximity between an inmate's conduct and speech and adverse action, … vindication in a disciplinary proceeding arising from the alleged retaliation, and statements by the retaliator concerning his or her motivation.").  Given these circumstances, summary judgment is DENIED as to Lieutenant Frenis as well.

---

[4] Specifically, Defendants cite paragraphs 12 through 49 of the Local 56(a)1 Statement, which incorporate Exhibits A (video) and B (declaration).

C.    *Count Two: Excessive Force Against Lieutenant Frenis*

The parties dispute whether the video evidence establishes Lieutenant Frenis' use of a chemical agent was justified as a matter of law.  Defendants keep the issue narrow, focusing exclusively on the incident captured in the video footage.  (*See* Dkt. 194-1 at 11–14.)  Baltas contends that the surrounding events—including Lieutenant Frenis' threat that he would set him up, failure to follow procedure, and "post incident behaviors"—is evidence that, together with the video, establish a genuine issue of material fact as to the excessive force claim. (Dkt. 246-1 at 16.)

The Eighth Amendment protects against punishments that "involve the unnecessary and wanton infliction of pain." *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  An inmate alleging excessive force in violation of the Eighth Amendment has the burden of establishing both an objective and subjective component to his claim. *Sims v. Artuz*, 230 F.3d 14, 22 (2d Cir. 2000); *see also Romano v. Howarth*, 998 F.2d 101, 105 (2d Cir. 1993).

To meet the objective component, the inmate must allege that the defendant's conduct was serious enough to have violated "contemporary standards of decency." *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (internal quotation marks and citation omitted).   The use of pepper spray "has a variety of incapacitating and painful effects … and, as such, its use constitutes a significant degree of force." *Tracy v. Freshwater*, 623 F.3d 90, 98 (2d Cir. 2010).   A malicious use of force constitutes a *per se* Eighth Amendment violation because "contemporary standards of decency are always violated." *Blyden v. Mancusi*, 186

21

F.3d 252, 263 (2d Cir. 1999) (citations omitted); *see also Hudson*, 503 U.S. at 9 (explaining "[w]hen prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated" irrespective of whether significant injury is present).

The subjective component requires the inmate to show that the prison officials acted wantonly and focuses on "whether force was applied in a *good*-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson*, 503 U.S. at 7 (citing *Whitley v. Albers*, 475 U.S. 312, 320–21 (1986)) (emphasis in original). The court considers factors including "the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Id.* (internal quotations and citation omitted).

Whether Lieutenant Frenis' use of pepper spray violated Baltas' constitutional rights is highly context specific.  On the one hand, "[c]ourts within the Second and other Circuits have held that the use of a chemical agent is not an unacceptable means of gaining control of an inmate who is disruptive."  *Gulley v. Hall*, No. 3:15cv962(MPS), 2017 WL 1078630, at *6 (D. Conn. Mar. 21, 2017). On the other hand, the Second Circuit has stated that pepper spray "should not be used lightly or gratuitously" when the individual is compliant "or otherwise poses no immediate threat."  *Tracy*, 623 F.3d at 98 (discussing use of pepper spray in context of non-detained arrestee).

Here, the Court finds the record contains triable issues of fact.  In broad terms, the video evidence establishes that the events took place in quick succession, and it is not abundantly clear what transpired.  Lieutenant Frenis first deploys the chemical agent within five minutes of the video's start.  Due to the quality of the video and where individuals were standing, the timing of Lieutenant Frenis' warnings and his use of the chemical agent are unclear.  (*See* Dkt. 241 at Ex. 5 at 00:00–5:29.)

There is also a disputed issue of fact as to whether Baltas threatened Lieutenant Frenis.  Lieutenant Frenis declares that he used the chemical agent in response to Baltas' threat to stab staff with a toothbrush.  (*See* Dkt. 194-4 ¶¶ 17–21.)  Baltas declares that he made no such threat.  (Dkt. 241-3 Ex. 1 ¶¶ 12, 16, 34–36, 41) (incorporating Attach. D).)  There is a brief time period before Lieutenant Frenis first deploys the chemical agent in which Baltas is speaking but it is unclear what he is saying.  (Dkt. 241-3 Ex. 5 at 04:00–23.)   Shortly after, Lieutenant Frenis says, "Drop the weapon."  In response, Baltas asks, "Drop <u>what</u> weapon?"  (*Id.* at 04:23 (emphasis added).)  Because of the conflicting evidence concerning the circumstances leading up to and during Lieutenant Frenis' use of pepper spray, it will be up to the jury to conclude whether such use of force was excessive.  *See Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d Cir. 2003) ("It is well established that [c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment.") (internal quotation marks omitted); *Ambrose v. Mulligan*, No. 3:20-cv-723 (KAD), 2021 WL 2351854, at *3 (D. Conn. June 9, 2021) ("Conflicting

affidavits generally create an issue of disputed fact."); *Jones v. Wagner*, No. 3:20-CV-00475 (VAB), 2022 WL 1525134, at *7 (D. Conn. May 13, 2022) (stating "the distance from which the chemical agent was used on Mr. Jones may enhance his claim of excessive force").

### D.   *Count Three: Deliberate Indifference Against Lieutenant Frenis*

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) ("[D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment.") (internal quotation marks and citation omitted).   Typically, deliberate indifference claims arise from two types of scenarios: cases where an inmate is deprived of all medical care and cases where the medical care is delayed or interrupted.  *See Benjamin v. Pillai*, 794 F. App'x 8, 11 (2d Cir. 2019).  The latter applies here.  (Dkt. 21 ¶¶ 88–89.) As with Baltas' excessive force claim, his deliberate indifference claim requires proving both an objective and subjective element.

To satisfy the objective element when an inmate's deliberate indifference claim is based on "a temporary delay or interruption" of treatment, the court must "focus on the challenged *delay* or *interruption* in treatment rather than the prisoner's *underlying medical condition* alone…."  *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)) (emphasis in original).   The "serious medical need" inquiry should "take into account the severity of the temporary deprivation alleged by the prisoner." *Id.* at 186–87.  The objective element is context- and fact-specific;  meaning, "severity

24

of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances." *Id.* at 187 (remanding for consideration of delay in administering plaintiff's HIV medication); *Valdiviezo v. Boyer*, 752 F. App'x 29, 32 (2d Cir. 2018) (finding objective element not met when hour-long delay did not result in exacerbated injuries). Relevant factors include the "absence of adverse medical effects or demonstrable physical injury." *Id.* at 187; *see Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) ("In cases where a prisoner alleges a delay in medical treatment, courts examine both the seriousness of the prisoner's medical conditions and the harm caused by any unreasonable delay."); *Alvarez v. Wright*, 797 F. App'x 576, 579 ("If the basis of the complaint is a temporary delay, as here, it is appropriate to focus on the effect of that challenged delay in treatment in determining whether the risk was objectively serious.").

To meet the subjective element, the inmate must show that the prison official had the requisite state of mind: he was actually aware that his or her actions or inactions would cause a substantial risk of serious harm to him. *See Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006); *Lombardo*, 807 F. App'x at 122–23. The objective standard is akin to recklessness. *See Salahuddin*, 467 F.3d at 280.

Defendants argue that Baltas cannot establish a triable issue of fact that Lieutenant Frenis was deliberately indifferent to his medical needs under both the objective and subjective prongs. With respect to the objective prong, Defendants argue that residual effects of a chemical agent is not necessarily "sufficiently serious" and, in this case, he did not suffer an asthma attack or otherwise require medical treatment. (Dkt. 194 at 23–24.) As for the subjective prong, Defendants

25

contend the video evidence establishes Lieutenant Frenis did not delay his treatment or otherwise act with reckless indifference.  (*Id.*)  Baltas points out that he had difficulty breathing, required a nebulizer after the event, and thereafter needed to use an inhaler four times a day for several months.  (Dkt. 246-1 at 24.)  He also alleges that he was not treated until approximately ten minutes after Lieutenant Frenis exited the unit.  (*Id.* at 25.)

With respect to the objective prong, Defendants did not provide any evidence supporting their position.  Moreover, Defendants applied the wrong legal standard, addressing a "denial in treatment" rather than a "delay in treatment."  Because the objective prong is fact-specific, *see Smith*, 316 F.3d at 185, and the Court was not presented with any evidence, the Court finds Defendants failed to satisfy Rule 56(c) and instead turns to the subjective element.

The Court finds that, based on this particular record, no reasonable jury could conclude that Lieutenant Frenis acted with a sufficiently culpable state of mind.  It is undisputed that Defendants escorted Baltas to OPM "no more than fifteen minutes" after Lieutenant Frenis learned Baltas complained about breathing difficulty.  (Dkt. 246-1 ¶ 41.)  Neither party submitted any medical records, meaning there is no evidence of his pre-existing or underlying health conditions or long-term health effects resulting from this incident.  The evidence Baltas submitted merely establishes that Baltas had "trouble breathing and went to medical for a breathing treatment."  (Dkt. 241 Ex. 10 at 4.)  Construing the evidence in Baltas' favor, the Court recognizes it is possible Lieutenant Frenis said to take "the long way" because there are moments in the video when voices are unintelligible. (*See*

*id*; Dkt. 246-1 at 25.)  But this comment is not enough to establish the subjective prong.  First, there is no motive implicit in the statement itself.  Second, there could have been a penological reason—such as safety and security—for going the "long way."  The objective video evidence also shows he was able to walk to OPM, Lieutenant Frenis escorted him, and Baltas received a breathing treatment within 15 minutes of Lieutenant Frenis learning he needed medical care. (*See* Dkt. 241 Exs. 5, 7 & 10.)  Accordingly, the Court finds a reasonable jury could not conclude Lieutenant Frenis was "actually aware" of a "substantial risk of serious harm" given these particular circumstances.  *Salahuddin*, 467 F.3d at 280; *see generally Washington v. Artus*, 708 F. App'x 705, 709 (2d Cir. 2017) ("On this record, no reasonable jury could find that the approximately four hours that elapsed between his injury and his arrival at the emergency room was a sufficiently serious deprivation of medical care or that the defendants were deliberately indifferent to his needs during that period.").

E.    *Count Four: Battery Against Officer McGoldrick*

Defendants argue Baltas' common law battery claim against Officer McGoldrick should be dismissed, because the Court should decline to exercise supplemental jurisdiction.  This argument is premised on the assumption that the Court will dismiss all federal claims.  Given that federal claims will proceed to trial, the Court will continue to exercise supplemental jurisdiction over Count Four. Defendants do not challenge the merits of the claim by analyzing the elements of common law battery and presenting evidence to show there is no genuine material fact for a jury to decide. *See Alteiri v. Colasso*, 168 Conn. 329, 334 n.3 (1975)

(quoting 1 Restatement (Second), *supra*, § 13); *Maselli v. Reg'l Sch. Dist. No. 10*, 198 Conn. App. 643, 659, *cert. denied,* 335 Conn. 947 (2020); *see* Fed. R. Civ. P. 56(c); *Bennett*, 343 F.3d at 139.   By failing to cite to admissible evidence, defendants have not satisfied their burden of showing either that there is no genuine, issued material fact, or that the plaintive cannot present admissible fax to establish his claims.  Fed. R. Civ. P. 56(c).

F.   *Count Five: Failure to Supervise and Protect Against Supervisory Defendants*

Defendants do not separately brief Count Five but rather rely on their general *Tangreti* argument, *infra* at III.A.   Accordingly, the Court DENIES summary judgment for the same reasons stated above.

G.   *Count Six: Deprivation of Due Process Against Defendants Egan and Jones*

The due process violation alleged under Count Six concerns the Deputy Wardens' "seizure and examination" of Baltas' legal work.   In addition to Defendants' *Tangreti* argument, which the Court found unpersuasive, *infra* at III.A., Defendants address the substance of Count Six.   Defendants argue that confiscation or property loss is not a cognizable claim under § 1983; rather, the proper channel to bring lost or damaged property claims is before the Connecticut Claims Commissioner.  (Dkt. 216 at 9–10.)  Although Baltas does not present any legal basis contradicting Defendants' arguments, he relies on Mahoney's affidavit and video evidence as factual support.  (Dkt. 246-1 at 33.)

Defendants are correct that claims for deprivation of property under 42 U.S.C. § 1983 are only viable when the individual does not have a state-provided post-deprivation remedy. *See Edwards v. Erfe*, 588 F. App'x 79, 80 (2d Cir. 2015)

(citing *Hudson v. Palmer*, 468 U.S. 517, 533 (1984)).  Defendants are also correct that the Second Circuit held in *Edwards v. Erfe* that Connecticut affords an adequate post-deprivation remedy under § 4-141, et seq., of the Connecticut General Statutes, which permits an inmate to bring a lost property claim before the Claims Commissioner. *See id.*

But Defendants err in their interpretation of Count Six.  Baltas does not allege ordinary personal property was lost or stolen.  Rather, he alleges Defendants Egan and Jones "seiz[ed] and examin[ed] …[his] <u>legal papers</u>, beyond mere inspection of those papers for concealed contraband" and that these actions violated his Fourteenth Amendment rights.  (Dkt. 21 ¶ 95 (emphasis added).)  As Baltas clarifies in his opposition, his due process violation stem from the fact that his adversaries read through and inspected his legal documents, not that they took his (non-legal) personal property. (*See* Dkt. 246-1 at 33.)  It has long been held that the "intentional obstruction of a prisoner's access to the courts is precisely the sort of oppression that the Fourteenth Amendment and section 1983 are intended to remedy." *Morello v. James*, 810 F.2d 344, 347 (2d Cir. 1987).  This extends to "intentionally and selectively" taking "legal materials." *Id.* at 344, 347.  Because the seizure and examination of Baltas' legal documents is a recognized basis for depriving an individual his First Amendment right to access the courts, Baltas is not required to bring the claim before the Claims Court.  *See id.*

Absent any evidence or legal authority establishing entitlement to summary judgment, this claim must proceed to trial. *See Bennett*, 343 F.3d at 139.

### H.   *Count Seven: Deprivation of Due Process Against Calderon*

Baltas' second due process violation allegations relate to Counselor Supervisor Calderon's denial of an advocate at his chronic discipline hearing, which was held without him.   Defendants argue the hearing was held for an "administrative purpose," not for a "disciplinary purpose," and therefore he had minimal due process protection.   (Dkt. 216 at 12.)   Defendants also point to evidence in another *Baltas* case—*Baltas v. Jones et al.*, 21-cv-469 (MPS)—and asks the Court to take judicial notice that he was given an advisor, declined the assistance of one, submitted a written statement that was considered by the hearing officer.   Baltas states that "the Court need not consider this matter at all" because he is pursuing them in *Baltas v. Jones et al.*, 21-cv-469 (MPS).   This claim is therefore dismissed as misjoined.

### I.   *Count Eight: Atypical and Significant Hardship Against All Defendants*

For Count Eight, Baltas alleges he "was assigned to continuous restrictive housing placements (including but not limited to 'chronic' placement), which subjected him to atypical and significant hardship for many months, in violation of the fourth, eighth, and fourteenth amendments to the Constitution of the United States."   (Dkt. 21 ¶ 99.)   Defendants argue he has not shown he has a liberty interest, because he merely alleges in the Amended Complaint that he was placed on chronic discipline status.   (*See* Dkt. 216 at 16.)   Baltas contends that he was placed in solitary for several months as a result of false disciplinary reports for which he was later vindicated.   (Dkt. 246-1 at 34.)   Neither party cites any evidence.

As the Court has already explained, it is Defendants' burden to identify evidence that establishes an <u>absence</u> of material fact.  *See Celotex*, 477 U.S. at 323. Defendants failed to submit any evidence whatsoever tending to show Baltas was classified as a chronic disciplinary inmate based on disciplinary charges other than the ones on which he was exonerated.   The absence of such evidence forecloses summary judgment.  *See* Fed. R. Civ. P. 56(c); *Bennett*, 343 F.3d at 139. Count Eight will therefore proceed to trial.

> **J.**    *Qualified Immunity*

Finally, Defendants argue they are entitled to qualified immunity because "caselaw  does not clearly establish that the plaintiff's constitutional rights were violated by any of the defendants."  (Dkt. 194-1 at 27.)  "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (internal quotation marks omitted).   In the initial summary judgment motion, Defendants cite the legal standard for qualified immunity but do not apply it to any of the specific Counts or Defendants. (*See* Dkt. 194-1 at 25–27.)[5] As the Supreme Court of the United States has explained, when a lower court assesses the "clearly established right," "[t]he dispositive question is whether the violative nature of *particular* conduct is clearly established."  *Id.* at 12 (emphasis in original) (internal quotation marks omitted).   Meaning, the inquiry "must be taken in light of the

---

[5] Defendants reassert the exact same argument in the supplemental motion at pages 17 through 19.  The Court does not separately address or acknowledge this section.

specific context of the case, not as a broad general proposition." *Id.* Absent any reference to the specifics of the case, the qualified immunity argument fails.

The Court notes that Defendants do specifically argue Defendants Andrade, Calderon, Frenis, Gomes, Gryken, Guest, LeFevre, Ragauskas and Peralta are entitled to qualified immunity as to Count One. (*See* Dkt. 194-1 at 21–23; Dkt. 216 at 7–9.) Summary judgment was denied as to Count One, because Defendants failed to provide any evidence—therefore, Defendants cannot establish entitlement to qualified immunity. *See City of Tahlequah, Okla. v. Bond*, 142 S. Ct. 9, 11 (2021) (evaluating qualified immunity based on the record); *Bennett*, 343 F.3d at 139.

## IV.   <u>Separate Trials</u>

The Federal Rules of Civil Procedure establish rules and limitations for joining claims and parties in one action. With respect to claims, Rule 18 permits a party to bring "as many claims as it has against an opposing party." Fed. R. Civ. P. 18(a). While this rule does not place any limitation on subject matter, according to the advisory committee notes, the Court retains the "power to direct an appropriate procedure for trying the claims." *See* Fed. R. Civ. P. 18(a) 1996 amend. Rule 42 establishes the procedure for separate trials: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, or third-party claims." Fed. R. Civ. P. 42(b).

While Rules 18 and 42 govern the procedure for separate claims against the same parties, Rule 20 addresses the joinder of parties. Under Rule 20, a plaintiff may sue multiple defendants in the same lawsuit only if the allegations arise "out

of the same transaction, occurrence, or series of transactions or occurrences" and there are "question[s] of law or fact common to all defendants."  Fed. R. Civ. P. (a)(2). Severance may be appropriate when the complaint fails to satisfy this Rule. *See* Fed. R. Civ. P. 21; *Sanchez v. O'Connell*, No. 3:08cv706 (JBA), 2010 WL 7862797, at *1 (D. Conn. Sept. 27, 2010) (noting that courts have held claims are misjoined when they fail to satisfy Fed. R. Civ. P. 20(a)); Fed. R. Civ. P. 20(a)(2) (establishing that defendants may be joined in an action if a right to relief is asserted against them "with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action").

　　　To summarize, this case involves eight causes of action against 11 Defendants and alleges facts that appear to be several distinct transactions or occurrences.  These distinct transactions or occurrences include: (1) certain Defendants' threats to intimidate and retaliate against Baltas and the Supervisory Defendants' failure to supervise their subordinates (Counts One and Five); (2) Lieutenant Frenis' use of a chemical agent (Counts Two and Three); (3) Officer McGoldrick's use of force by slamming the trap door on Baltas' hand (Count Four); (4) Defendants Egan's and Jones' seizure and inspection of Baltas' legal papers (Count Six); and (5) Counselor Supervisor Calderon's handling of a chronic discipline hearing (Count Seven).  Baltas alleges he was placed in the RHU as a result of the allegations related to events (1), (4), and (5) (Count Eight).  The fifth transaction or occurrence is no longer an issue in this case by virtue of Baltas' seeking dismissal to litigate the claim in *Baltas v. Jones et al.*, 21-cv-00469 (MPS).

The Complaint does not allege facts that suggests these events are related. Given the several apparently distinct issues, trying all of them together in one trial could lead to juror confusion or prejudice to a party.  That being said, severance into separate actions under Rule 21 is not appropriate because every Defendant overlaps with each other through one count or another.  *See* 6A Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1585 (3d ed.) (updated Apr. 2023) ("Once parties are properly joined under any of those rules as to a particular claim, additional claims, whether they are related or unrelated or they are by or against all or less than all of the parties may be joined under Rule 18(a)"). The proper procedure may be to conduct separate trials for distinct events, preserving the right to a jury trial in each trial.  *See* Fed. R. Civ. P. 42(b); *Wynne v. Town of East Hartford*, 2021 WL 5494606, at *5 (D. Conn. Nov. 23, 2021) ("Under Federal Rule of Civil Procedure 42(b), a district court has broad discretion to try issues and claims separately in order to 'further convenience, avoid prejudice, or promote efficiency.'") (quoting *Amato v. City of Saratoga Springs*, 170 F.3d 311, 316 (2d Cir. 1999)).  Separate trials may help "avoid or minimize prejudice," "produce economies in the trial of the matter," or "lessen or eliminate the likelihood of juror confusion."  *Svege v. Mercedes-Benz Credit Corp.*, 329 F. Supp. 2d 283, 284 (D. Conn. 2004); *Computer Assocs. Int'l v. Simple.com, Inc.*, 247 F.R.D. 63, 67 (E.D.N.Y. 2007) ("To determine whether bifurcation is warranted, courts generally consider the following three factors: 1) whether significant resources would be saved by bifurcation, 2) whether bifurcation will increase juror comprehension, and

3) whether bifurcation will lead to repeat presentations of the same evidence and witnesses.") (citation omitted).

Accordingly, the Court orders briefing on the issue of conducting separate trials for the distinct issues.  On or before September 26, 2023, Baltas and counsel for Defendants are ordered to each file a status report indicating (1) whether the party wants separate trials; (2) if so, listing the distinct transactions or occurrences; (2) stating which Counts are associated with which transaction or occurrence; (3) and indicating why separate trials would be prudent for each separate transaction or occurrence.  When a party seeks separate trials, it is that party's burden to establish bifurcation is warranted.  *Svege*, 329 F. Supp. 2d at 284. Should the Court require additional briefing after the parties file their status report, it shall issue an additional order.

V.     Conclusion

For the above reasons, summary judgment is GRANTED as to Count Three and is DENIED as to Counts One, Two, Four through Six, and Eight.  The Court DISMISSES Count Seven so that Baltas may litigate the issue in a separate action, *Baltas v. Jones et al.*, 21-cv-00469 (MPS).  The Court REOPENS this case so that it may proceed to trial.

IT IS SO ORDERED

_____

Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: August 22, 2023